Argued and submitted March 17, 1999, reversed and remanded in part; otherwise
affirmed January 5, 2000

Leo G. GRAHAM
and A. Jane Graham, individuals and
Leo G. Graham and A. Jane Graham,
dba Gramark Co.,
*Appellants,*

*v.*

STATE OF OREGON,
City of Portland,
a municipal corporation,
Mocon Corporation,
an Oregon corporation,
F. E. Ward, Inc.,
a Washington corporation,
Robert A. Hatch,
an individual,
and N-B Hatch Co.,
an Oregon corporation,
*Respondents.*

(960402643; CA A98402)

995 P2d 1167

Gordon T. Carey, Jr., argued the cause and filed the briefs for appellants.

Peter A. Kasting, Senior Deputy City Attorney, argued the cause and filed the brief for respondents City of Portland and State of Oregon.

Levi J. Smith argued the cause and filed the brief for respondents Mocon Corporation, Robert A. Hatch and N-B Hatch Co.

Richard Cohn-Lee argued the cause for respondent F. E. Ward, Inc., With him on the brief were Richard S. Gleason and Stoel Rives LLP.

Before DeMuniz, Presiding Judge, and Haselton and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

Plaintiffs Leo and Jane Graham and Gramark Company appeal the trial court's judgment in favor of defendants, assigning error to the trial court's order granting defendants' motions for summary judgment. Plaintiffs alleged that defendants were responsible for hydrocarbon contamination of their property as a result of defendants' use of plaintiffs' property during a road construction project. The trial court held that the record contained no evidence that defendants caused the contamination of plaintiffs' property and granted defendants' motions for summary judgment. Plaintiffs assign three errors relating to the admission of affidavits, the merits of the judgment, and the parties included in the judgment. We conclude that the trial court properly admitted the evidence into the record.

Viewing the evidence in the light most favorable to plaintiffs, we conclude that, while summary judgment was appropriately granted with respect to defendant F. E. Ward, Inc., a disputed issue of material fact exists with respect to defendants the State of Oregon, the City of Portland, the contractor Mocon Corporation, and its subcontractor Robert Hatch and N-B Hatch Company. In particular, we conclude that a disputed fact question remains regarding whether subcontractor N-B Hatch Company placed contaminated fill material on plaintiffs' property in conjunction with its storage of construction material on plaintiffs' property or pursuant to a separate agreement with plaintiffs to place fill dirt on the property.[1] We therefore affirm in part, reverse in part and remand. *See Jones v. General Motors Corp.*, 325 Or 404, 939 P2d 608 (1997) (summary judgment improper where there exists a disputed issue of material fact).

We recite only the relevant facts. Defendants City of Portland (the city) and State of Oregon sought to expand an

---

[1] Because we find that disputed fact question dispositive, we do not address plaintiffs' other factual allegations.

extension of North Marine Drive along the Columbia Slough in Portland. The project was completed under an agreement between the city and state cooperatively to plan and complete roadway improvements on North Marine Drive. The state contracted the construction work and delegated authority to manage the project to the city. The project was divided into two phases. Defendant Mocon Corporation (Mocon) was the general contractor for the first phase of the project (phase I). Phase I began in March 1992 and ended in late August or early September 1993. It undertook to widen, improve and repave North Marine Drive from I-5 to the intersection of North Portland Road and North Marine Drive and expand and improve the intersection. It also began the first 300 yards of the westward extension of North Marine Drive. Defendants Robert Hatch and N-B Hatch Company (Hatch)[2] undertook, as subcontractor, the necessary excavation work. All of the evidence in the record regarding phase I pertains to the work conducted by Hatch as a subcontractor of Mocon, not by Mocon itself. The second phase (phase II) began in February 1994 and concluded in June 1995. Defendant F. E. Ward, Inc. (Ward), as the general contractor for phase II, continued the westward extension of North Marine Drive.

Plaintiffs' property sits near the intersection of North Marine Drive and North Portland Road. The city and state condemned a portion of plaintiffs' property as a right of way for the North Marine Drive extension. As a result, plaintiffs' property was essentially divided in half. The portion north of North Marine Drive is not at issue in this case. The southern parcel resembles a flag, which the parties further subdivide and refer to as the "flag portion" and the "pole portion." On the northern part of the flag portion, the city acquired a construction easement. In late 1995, plaintiffs discovered petroleum hydrocarbon contamination along the western side of the flag portion. (See map below.)

---

[2] Plaintiffs have sued Robert Hatch in his individual capacity. When we refer to Robert Hatch or Hatch, however, we refer to him in his official capacity as owner and agent of N-B Hatch Company.

In his affidavit, Leo Graham explained that the flag portion was reasonably uniform and flat before construction began and that its elevation was three to five feet below the present grade of North Marine Drive. In April 1994, after the first phase of construction and after commencement of the second phase of construction, Graham explained that he visited the property and noticed that the elevation seemed higher, approximately equal to that of North Marine Drive. He further explained that the fill material contained sand. Graham stated that, in the fall of 1995, he discovered that the property was contaminated. Bob Belding, a geologist, drilled test pits, and his report revealed contamination in five of the test pits. In his affidavit, Belding further explained that there was hydrocarbon contamination in the top three feet of soil on the west side of the flag portion only, that the contamination was due to diesel and heavy petroleum oil, and that the contamination was in newer fill material. His report indicated that the fill material in two of the contaminated pits contained sand and silt. Another contained silt and gravel.[3]

---

[3] The report did not contain data on the composition of the material in the other two contaminated pits, perhaps because they were drilled at an earlier date.

Graham stated that the cost of testing and remediation was in excess of $40,000.

The city's project manager, Jeanne Caswell, explained in her affidavit that the city discovered petroleum contamination on a portion of the right-of-way and construction easement in 1992 before construction began. That contamination was apparently removed by June 1992. Caswell stated that in each phase of construction, excavation and fill work occurred. However, only during the first phase of construction was the construction easement on the Graham property used for staging those activities. Caswell explained in her deposition that material was, from time to time, stored in the right-of-way and construction easement. That material consisted of: (1) material excavated early in the project from the Graham property itself, including concrete and asphalt; (2) riprap, rock, and dredge sand for completion of a revetment in 1992; and (3) roadway fill and surcharge material, including dredge sand. She agreed that the sand for the project, which was stored on the flag portion, was dredged from the Columbia River Slough and was never tested for contaminants. In her affidavit, she stated that all material was stored on either the right-of-way or the construction easement. However, when asked in her deposition to describe the easement, she could not state with specificity whether it covered the top half or only the top third of the flag portion. She also admitted that, on one occasion in 1992, she saw excavated material stored south of the construction easement; she then ordered the material removed. Caswell stated that she recalled several incidents of public dumping on different areas of the Graham property. In her affidavit, she explained that there were no barricades to the flag portion during phase II and that the flag portion was only partially fenced during phase I. That fencing did not completely cut off vehicle access to the property. Caswell also noticed cars parked all over the flag portion during phase II.

In his deposition, Hatch explained that he used the construction easement as a staging area for excavation work. There is no evidence in the record that Mocon, the city, or the state directly used the Graham property. Hatch claimed that

he did store some excavated material, including concrete, asphalt and blue clay, and some approved roadway, surcharge, and revetment material on the construction easement. However, Hatch asserted that, when he concluded work on the project, all of the material was removed, the flag portion was flat, and the flag portion was not filled to the rough elevation of North Marine Drive. Caswell explained in her deposition that, as standard conditions of the construction contract, all material had to be removed from the easement and Hatch had to grade the flag portion flat before leaving the project. However, she had no documentation of those conditions or that Hatch had complied with them. She also stated that Hatch did in fact level the most northern part of the flag portion to about the width of a bulldozer. Hatch completed its work on the project in August 1993, but Hatch explained that the company stored some equipment on the pole portion between August 1993 and January 1994 in exchange for demolishing a building on the Graham property.

Hatch recalled a conversation with Leo Graham when Graham and Graham's attorney visited the property in the fall of 1993. During that conversation, Hatch remembered expressing an interest in placing fill on the flag portion. Hatch, however, explained that he chose not to pursue that interest because of the conditions that Graham placed on the endeavor. Graham's recollection was that Hatch called him in late 1993 or early 1994 and offered to fill the property, Graham agreed, and, when Graham returned to the property in April 1994, it appeared to be filled. When Hatch returned to the property in 1996, he agreed that piles of dirt appeared to fill the property. At the same time, Hatch noticed that cars were parked all over the flag lot.

Plaintiffs offered three sets of photographs taken of the flag portion. The first set was taken in 1992 and showed piles of material all along the western side of the flag portion. That material included asphalt and concrete. It appears to corroborate Caswell's recollection that material excavated from the Graham property was stored on the flag portion, even south of the construction easement. Both Caswell and

Hatch claimed that the material was removed. Pictures taken in late July 1993, one month before Hatch concluded his work on phase I, reveal that the flag portion contained piles of different material along the western side. Pictures taken in October 1995 similarly reveal piles of unknown material along the western side of the flag portion. The placement of the piles of material in the 1993 pictures and in the 1995 pictures appear to roughly correspond. Caswell could not identify the composition of the material in the 1993 and 1995 pictures, nor could she conclude that the material in the 1993 and 1995 pictures appeared to be the same, or that they appeared to be different.

Ward began phase II in February 1994. Ward's project superintendent, Richard Phillips, recalled in his deposition that piles of material were already on the flag portion before Ward arrived on the project. He explained that the condition of the flag portion did not change during its involvement in the project. Caswell stated that the construction easement was not used as a staging area for the second phase of construction, and Phillips similarly asserted that neither Ward nor its subcontractors used the construction easement or flag portion for storage of material or equipment. Phillips also noted that the dredged sand used as fill for the construction project appeared to be different from the piles of material pictured on the flag portion in 1993 and 1995. However, he did not actually inspect the piles on the property. Caswell stated that Ward's involvement with the Graham property involve two incidents: (1) in late 1994, Ward and other contractors used the pole portion and eastern edge of the property, only, as a cut-through for vehicles; (2) in April 1995, the city discovered that maintenance of a cement truck on the property had led to the deposit of lime, which was subsequently removed.

In April 1996, plaintiffs filed suit to recover the costs that plaintiffs incurred to remediate and clean up the west side of the flag portion. The operative complaint alleged that the state as a party to a public contract, the city acting as the state's agent, and the named contractors were jointly and severally liable on theories of negligence and strict liability

under ORS 465.255. Under both the negligence and strict liability claims, plaintiffs alleged that defendants actually caused the contamination.[4]

The city filed a motion for summary judgment, arguing that there was no evidence that "any defendants are responsible for the presence of [the] contamination and there [was] significant evidence that the contamination came from other sources." Defendants Hatch, Mocon, and Ward expressly joined the city's motion. The city further argued that summary judgment should be granted in favor of the state on the same grounds asserted by the city. The city attached two affidavits in support of its motion for summary judgment, one from Caswell and one from Hatch. Plaintiffs objected to the affidavits, arguing that they were not based on personal knowledge. The trial court considered the testimony in Caswell's and Hatch's affidavits as pertaining to activities sufficiently within their personal knowledge. The

---

[4] ORS 465.255(1)(d) imposes strict liability for remedial action costs that are attributable to or associated with a facility on "[a]ny person who, by any acts or omissions, caused, contributed to or exacerbated the release * * *." That provision is consistent with plaintiffs' pleading that "defendants caused the contaminated fill to be placed on plaintiff's land, and/or caused the fill to become contaminated." However, ORS 465.255 also imposes strict liability on "any owner or operator" for the same costs under circumstances that would not require proof of actual causation of the release by a particular defendant. Plaintiffs did not specifically allege that defendants were "owners or operators" of plaintiffs' property, nor do they here argue that proof of actual causation by a particular defendant is not required for the statutory claim. Therefore, we focus our attention on proof of actual causation, by acts or omission, of contamination by a particular defendant.

Under the negligence claim, plaintiffs specifically alleged that defendants were negligent in placing or allowing contaminated fill to be placed on the property, in causing or permitting the fill to become contaminated after placing the fill on the property, in failing to test the fill material before placing it on plaintiffs' lot, or in failing to remove the contaminated fill.

Also under the negligence claim, the complaint alleges that the fill dirt, contamination, or contaminated fill dirt was placed on the plaintiffs' property "in or about the last six months of 1994, or early in 1995." Defendants, however, do not limit their arguments to that time period but defend against the possibility that defendants were responsible for placing that material on plaintiffs' property at an earlier date. We therefore are not compelled to limit our consideration of the record to those dates, where we must consider the evidence in the record in the light most favorable to plaintiffs, and in light of the trial procedure to allow the amendment of pleadings to conform to the evidence presented. See ORCP 23 B (governing amendments of pleadings to conform to the evidence).

trial court granted the defendants' motions for summary judgment, stating:

> "It is my opinion that on the evidence at hand no objectively reasonable juror could find any of the defendants responsible for the contamination. There is no evidence that any of them did the dumping."

The trial court held that summary judgment was effective as to the state because "the State of Oregon has potential liability only by way of the City's agency."

Plaintiffs make three assignments of error. Plaintiffs first assign error to the trial court's receipt of Caswell's and Hatch's affidavits, arguing that neither was based on personal knowledge. We agree that the affidavits were sufficiently based on personal knowledge to be admissible and affirm the trial court's admission of them without further discussion.

Plaintiffs second assign error to the trial court's grant of summary judgment in favor of defendants on the merits of the negligence and statutory claims and, third, assign error to the trial court's grant of summary judgment in favor of the state where the state did not, independently, move for summary judgment. On the second assignment of error, we review to ascertain whether there are genuine issues of material fact and whether defendant is entitled to judgment as a matter of law. *Jones,* 325 Or at 408; *Quillen v. Roseburg Forest Products, Inc.,* 159 Or App 6, 9, 976 P2d 91 (1999). Viewing the evidence in the light most favorable to plaintiff, we examine whether an "objectively reasonable juror could return a verdict for [plaintiffs] on the matter that is the subject of the motion for summary judgment." ORCP 47 C.[5] Because we conclude that a material fact question

---

[5] ORCP 47 C (1997) provided, in part:

"The judgment sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No genuine issue as to a material fact exists if, based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment."

Oregon Laws 1999, chapter 815, amended ORCP 47 C. Section one of the act added the following language to the end of the paragraph quoted above:

exists with respect to Hatch, and, therefore, with respect to Mocon, the city, and the state, we do not need to address plaintiffs' third assignment of error. We do, however, conclude that no disputed issue of material fact exists with respect to Ward and affirm summary judgment in favor of Ward.

To recover on either the negligence or strict liability theory, plaintiffs must produce sufficient evidence to make out a *prima facie* case that defendants, rather than a third party, caused or allowed the contamination. Defendants' motions for summary judgment sought to demonstrate that plaintiffs presented no evidence of causation by any of the defendants. Defendants focus on the fact that the public had access to the property at all times during construction and the fact that the property had a history of public dumping. Because of those facts, defendants argue, it is mere speculation to assume that the city or its contractors, rather than a third party, placed contaminated material on plaintiffs' property, where, defendants argue, there is no evidence that defendants placed or caused the contamination on plaintiffs' property. We must examine the evidence to determine whether it supports an inference that the defendants were the ones that caused the contamination. If such an inference

---

"The adverse party has the burden of producing evidence on any issue raised in the motion as to which the adverse party would have the burden of persuasion at trial. The adverse party may satisfy the burden of producing evidence with an affidavit under section D of this rule. * * *."

Section two of the act provides that: "The amendments to ORCP 47 C * * * apply to all actions pending on or commenced after the effective date of this 1999 Act."

This case was pending before the Court of Appeals, not the circuit court, when the Act went into effect. The parties do not argue that any evidentiary changes effected by the amended version of ORCP 47 C should be applied in this case in the first instance on appeal, and we decline to apply those amendments on our own motion. *See Doe v. American Red Cross*, 322 Or 502, 910 P2d 364 (1996) (in affirming reversal of summary judgment on the ground that the moving party had failed to demonstrate the absence of a genuine issue of material fact, Supreme Court did not apply, on its own motion, the 1995 amendments to ORCP 47 C that applied to "all actions, whether commenced before, on or after the effective date" of the amendments); *cf. Jones v. General Motors Corp.*, 139 Or App 244, 264, 911 P2d 1243 (1996), *aff'd on other grounds* 325 Or 404, 939 P2d 608 (1997) (applying revised summary judgment standard on appeal would violate due process); *see also State v. Meyers*, 153 Or App 551, 559-60, 958 P2d 187 (1998) (changing the rules of evidence, retroactively, raises serious questions of due process).

can be drawn from the evidence, a disputed issue of material fact exists for the jury to resolve.

Plaintiffs attempt to invoke a *res ipsa loquitur* theory to establish defendants' liability. *Res ipsa loquitur* is a rule of evidence whereby circumstantial evidence may be used to prove ultimate facts, including both negligence and causation if " 'the accident which occurred * * * is of a kind which more probably than not would not have occurred in the absence of negligence on the part of the defendant.' " *McKee Electric Co. v. Carson Oil Co.*, 301 Or 339, 353, 723 P2d 288 (1986) (quoting *Watzig v. Tobin*, 292 Or 645, 649, 642 P2d 651 (1982)). For *res ipsa loquitur* to apply, plaintiffs must show that the inference of negligence is attributable to a particular defendant. *Fieux v. Cardiovascular & Thoracic Clinic, P.C.*, 159 Or App 637, 643, 978 P2d 429, *rev den* 329 Or 319 (1999). Establishing causation may be accomplished by a jury's rational inference based either upon a showing of some specific instrumentality causing injury that is within a defendant's responsibility or upon a showing that a defendant was responsible for all reasonably probable causes of the accident. *Id.* at 643-44.

Plaintiffs have failed to establish that here. The uncontroverted evidence is that the flag portion was accessible to the general public and that the property was subject to public dumping; thus it cannot be said that defendants here were responsible for all reasonably probable causes of contamination. Plaintiffs also have not identified that the instrumentality of injury, the contaminated soil or contaminated material, was, in fact, defendants', rather than a third party's, responsibility. Indeed, that disputed fact is the very issue of this case.

Under both plaintiffs' direct negligence and strict liability theories, plaintiffs seek to draw one of two major inferences regarding causation, that the contamination occurred as a direct result of the construction of the road project or as a result of an independent agreement by Hatch to fill plaintiffs' flag lot. We begin with the undisputed facts. Before construction began on phase I, there were no piles of material on the western edge of the flag portion and there was no known hydrocarbon contamination in that area. By

April 1996, after completion of both phases of construction, piles of material occupied the western edge of the flag portion and hydrocarbon contamination also existed on the western edge of the flag portion and extended south of the city's construction easement on plaintiffs' property. (See map above.) The contamination occurred in "fill" material that, in part, consisted of sand and silt.

We turn to the rest of the record. Plaintiffs' theory is that the 1995 piles of material represent the "fill material" that Belding described as containing the hydrocarbon contamination. That theory can be supported by: Leo Graham's representation that, by April 1994, the property was "filled"; Phillips's deposition that the 1995 photos represented the state of the property from February 1994 until June 1995; and Hatch's deposition that the property appeared "filled" in 1996 after commencement of the suit.

■ We can therefore eliminate one possibility, that Ward was a party responsible for the contamination of plaintiffs' property. First, Caswell's affidavit and Phillips's deposition together explain that Ward did not use plaintiffs' property as a construction staging area, that Ward briefly used the eastern edge of the flag and pole portions as a vehicle cut-through, and that Ward caused one incident of lime contamination in the same eastern area. Caswell also explained that the public had access to the property at that time, that the public parked on the flag portion at that time, and that the property had often been used for illegal dumping by the public. Plaintiffs' evidence is merely that Ward *could have* driven over or used the western edge of the flag portion, just as easily and as likely as any third party could have. Thus, the *only* evidence in the record concerning contamination is that Ward caused lime, and perhaps hydrocarbon, contamination in the eastern, not western, edge of plaintiffs' property.[6] And, the *only* evidence in the record concerning the fill material is that the piles of material predated Ward's arrival on the construction project. That Ward exercised responsibility over,

---

[6] Plaintiffs, however, do not assert that the eastern edge is contaminated by petroleum products.

used, stored material, or otherwise caused hydrocarbon contamination on the western edge of the flag portion is therefore mere speculation, and we affirm summary judgment in favor of Ward.[7]

■ We next turn to Hatch and conclude that summary judgment was improper. From the fact that Hatch, at one point, stored material in the contaminated area of the flag portion and the fact that it regularly stored dredge sand on the property, one can infer that Hatch placed dredge sand south of the construction easement, along the western edge of the flag portion. Because the sand was never tested for contamination, one can infer that the Columbia Slough provided sand contaminated with hydrocarbons. In addition, given the rough correspondence between the 1993 and 1995 pictures, one can infer that Hatch placed that contaminated sand on the property before August 1993. Alternatively, given the record's indication that Hatch either removed or leveled the material pictured in 1993 and that Hatch inquired about placing fill on the property, one can infer that Hatch placed contaminated material on the property sometime between August 1993 and when it vacated the property in January 1994.

Whether Hatch, in fact, placed contaminated material on plaintiffs' property, either in conjunction with his storage of construction material or pursuant to a separate agreement with Leo Graham, is precisely the disputed fact question appropriate for a jury to determine.[8] In that determination, a jury would weigh: Phillips's testimony that the material pictured in 1995 appeared different from the dredge sand fill material used in the project; the credibility of Hatch's statement that he removed all material from the property; the fact that the property was accessible to dumping by the public; and other information. However, we cannot

---

[7] That reasoning dismisses the possibility that Ward caused the contamination by negligently failing to test the fill material before placing it on plaintiffs' property, negligently failing to remove the material, or by omitting to remove the contamination. Thus, we do not separately examine the record with respect to those allegations.

[8] We note that the record does not support any inference that Hatch placed any material on plaintiffs' property in conjunction with any other purpose or activity than the two listed above.

say that the evidence entitles the remaining defendants to judgment as a matter of law, because the issue involving those defendants include issues of credibility and they do not rebut the inferences one can draw from plaintiffs' evidence.

On that basis, we conclude that summary judgment was improperly granted in favor of Hatch.[9] Because Hatch may have placed contaminated soil on plaintiffs' property when he was acting as a subcontractor for Mocon, and because it otherwise acted as an agent for the city and the state, those parties are potentially subject to vicarious liability for Hatch's conduct; thus summary judgment was improperly granted as to those defendants as well.[10] We therefore reverse summary judgment in favor of those defendants and remand on the theory that those defendants negligently or, under ORS 465.255(1)(d), by acts or omissions, caused contamination of plaintiffs' property. We affirm summary judgment in favor of Ward.

Reversed and remanded as to all defendants except defendant F. E. Ward, Inc.; otherwise affirmed.

---

[9] Again, because we find dispositive the disputed fact question regarding Hatch's alleged dumping of contaminated materials on plaintiffs' property, we do not separately address plaintiffs' other fact allegations in the complaint with respect to Hatch.

[10] We do not address whether the record allows an inference of direct liability on the negligence or statutory claim with respect to any of those defendants.