Argued and submitted January 20, 1999, affirmed November 1, 2000

Deborah J. FLUG,
*Appellant,*

*v.*

UNIVERSITY OF OREGON,
*Respondent.*

(16-96-04247; CA A99397)

13 P3d 544

David C. Force argued the cause and filed the briefs for appellant.

Jas. Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer,* Judges.

ARMSTRONG, J.

---

* Brewer, J., *vice* Warden, S. J.

.

## ARMSTRONG, J.

Plaintiff brought this action for unlawful employment practices and intentional infliction of emotional distress (IIED). Plaintiff claimed that defendant violated ORS 659.425 by

> "discriminating against Plaintiff in the terms, conditions, or privileges of employment * * * because she has a mental impairment which, with reasonable accommodation by the employer, would not prevent the performance of work for Defendant; and/or because Plaintiff has a record of such impairment; and/or because Defendant regards Plaintiff as having a mental impairment."[1]

Plaintiff also claimed that defendant retaliated against her for her opposition to defendant's unlawful employment practices, thereby violating ORS 659.030(1)(f).[2] Finally, plaintiff

---

[1] ORS 659.425 was extensively amended in 1997. Or Laws 1997, ch 854, § 13. The 1995 version of the statute, which was in effect at the time of plaintiff's removal from employment with defendant, provided, in relevant part:

> "(1) For the purpose of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment because:

> "(a) An individual has a physical or mental impairment which, with reasonable accommodation by the employer, does not prevent the performance of the work involved;

> "(b) An individual has a record of a physical or mental impairment; or

> "(c) An individual is regarded as having a physical or mental impairment.
> "* * * * *

> "(5) Receipt or alleged receipt of treatment for a mental disorder shall not constitute evidence of a person's inability to perform the duties of a particular job or position * * *."

In this opinion, all references to ORS 659.425 are to the 1995 version of the statute.

[2] ORS 659.030(1)(f) provides:

> "For the purposes of ORS 659.010 to 659.110, 659.227, 659.330, 659.340, and 659.400 to 659.545, it is an unlawful employment practice:
> "* * * * *

> "For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because the person has opposed any practices forbidden by this section, ORS 30.670, 30.685, 659.033 and 659.400 to 659.460, or because the person has filed a complaint, testified or assisted in any proceeding under ORS 659.010 to 659.110 and 659.400 to 659.545 or has attempted to do so."

claimed that two of defendant's employees intentionally caused her to suffer extreme emotional distress. Defendant moved for summary judgment, contending, *inter alia*, that plaintiff had failed to give timely notice of her IIED claim as required by ORS 30.275.[3] The trial court granted defendant's motion and entered judgment for defendant. We affirm.

---

[3] ORS 30.275 provides:

"(1) No action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 to 30.300 shall be maintained unless notice of claim is given as required by this section.

"(2) Notice of claim shall be given within the following applicable period of time, not including the period, not exceeding 90 days, during which the person injured is unable to give the notice because of the injury or because of minority, incompetency or other incapacity:

"(a) For wrongful death, within one year after the alleged loss or injury.

"(b) For all other claims, within 180 days after the alleged loss or injury.

"(3) Notice of claim required by this section is satisfied by:

"(a) Formal notice of claim as provided in subsections (4) and (5) of this section;

"(b) Actual notice of claim as provided in subsection (6) of this section;

"(c) Commencement of an action on the claim by or on behalf of the claimant within the applicable period of time provided in subsection (2) of this section; or

"(d) Payment of all or any part of the claim by or on behalf of the public body at any time.

"(4) Formal notice of claim is a written communication from a claimant or representative of a claimant containing:

"(a) A statement that a claim for damages is or will be asserted against the public body or an officer, employee or agent of the public body;

"(b) A description of the time, place and circumstances giving rise to the claim, so far as known to the claimant; and

"(c) The name of the claimant and the mailing address to which correspondence concerning the claim may be sent.

"(5) Formal notice of claim shall be given by mail or personal delivery:

"(a) If the claim is against the state or an officer, employee or agent thereof, to the office of the Director of the Oregon Department of Administrative Services.

"(b) If the claim is against a local public body or an officer, employee or agent thereof, to the public body at its principal administrative office, to any member of the governing body of the public body, or to an attorney designated by the governing body as its general counsel.

"(6) *Actual notice of claim is any communication by which any individual to whom notice may be given as provided in subsection (5) of this section or any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to*

Because the trial court decided this case by summary judgment, we view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the party opposing the motion—in this case, plaintiff. ORCP 47 C;[4] *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997). Plaintiff began working for defendant in 1984 in the University's Housing Department and eventually was promoted to Resident Services Supervisor, a position in which she had supervisory responsibilities. In 1994, plaintiff was diagnosed as suffering from depression and, beginning in August 1994, took leave from work in order to recover. Plaintiff returned to work in November 1994, although, on her doctors' orders, she worked on a restricted schedule. As of March 1995, plaintiff was still working on a restricted schedule.

In early April 1995, in the course of conversations with a co-worker, plaintiff commented that she understood the emotions of postal workers. Plaintiff's comment was apparently in reference to reported instances of postal

---

*the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body.* A person responsible for administering tort claims on behalf of a public body is a person who, acting within the scope of the person's responsibility, as an officer, employee or agent of a public body or as an employee or agent of an insurance carrier insuring the public body for risks within the scope of ORS 30.260 to 30.300, engages in investigation, negotiation, adjustment or defense of claims within the scope of ORS 30.260 to 30.300, or in furnishing or accepting forms for claimants to provide claim information, or in supervising any of those activities.

"(7) In an action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 to 30.300, the plaintiff has the burden of proving that notice of claim was given as required by this section.

"(8) Except as provided in ORS 12.120 and 12.135, but notwithstanding any other provision of ORS chapter 12 or other statute providing a limitation on the commencement of an action, an action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 to 30.300 shall be commenced within two years after the alleged loss or injury." (Emphasis added.)

The parties do not dispute that defendant is a public body entitled to notice under ORS 30.275. In addition, defendant concedes that it received proper notice as to plaintiff's unlawful employment practices claims.

[1] In 1999, the legislature amended ORCP 47 C. *See* Or Laws 1999, ch 815, § 2. Neither party raises, and we do not address, the effect of that amendment. *See Graham v. State of Oregon*, 164 Or App 747, 757 n 5, 995 P2d 1167 (2000).

employees who had committed acts of violence in the work-place. Plaintiff told her co-worker that she would never do anything like that, however, because she was not homicidal. In other conversations, plaintiff had told co-workers about her target shooting experiences and how, at one point, she was able to shoot pine cones out of a tree. Plaintiff's co-work-ers reported these conversations, along with other concerns about plaintiff's work, to plaintiff's supervisors. In response, Mike Eyster, the Director of University Housing, and Ron Tendick, plaintiff's direct supervisor, met with plaintiff on May 10, 1995. At that meeting, Eyster and Tendick pre-sented plaintiff with a memorandum outlining what they considered to be plaintiff's options. The memorandum detailed a number of conditions that plaintiff was required to meet in order to continue her employment. The first condi-tion was that plaintiff provide defendant with a "[f]ull release from counselor and doctor to return full time and ability to perform all job functions."

Plaintiff understood from the memorandum that she would be fired unless she immediately presented Eyster and Tendick with releases from her doctors to resume full-time work with no restrictions or accommodations to her illness or recovery process. Plaintiff told Eyster and Tendick that she could not fulfill their demand because her doctors had not yet released her to work full time, but they repeated their request for such a release. Plaintiff asked them whether they were ordering her to ask her doctors to lie about their medical opinions, but they did not respond. At the time of the meet-ing, Tendick had received letters from plaintiff's doctors stat-ing that they were releasing plaintiff to work six hours per day beginning May 10, 1995, seven hours per day beginning May 22, 1995, and eight hours per day (full time) beginning June 1, 1995. It is not clear from the record that plaintiff was aware of those letters.[5] Plaintiff was upset and hurt by her

---

[5] The letters made no mention of any accommodations that would be necessary for plaintiff to return to work full time. It is unclear from the record whether it is those letters to which plaintiff refers when she speaks of some communication between defendant and her doctors of which she was unaware until sometime after January 29, 1996. However, there is nothing else in the record to indicate the con-tent of any other communication between plaintiff's doctors and supervisors.

supervisors' comments and attitude and by the contents of the memorandum.

After the meeting, plaintiff contacted an attorney. On May 15, 1995, plaintiff wrote to Tendick stating that, with certain modifications of the stated conditions, plaintiff's return to work could be accomplished.[6] The letter went on to state that, although most of the return-to-work conditions were reasonable or within the University's right, the requirement of a full release to work without accommodations appeared to violate federal and state laws prohibiting discrimination against disabled employees. Plaintiff suggested a meeting in which her attorney and plaintiff's supervisors could "iron out" the concerns expressed in the letter. Having received no response to that letter, plaintiff again wrote Tendick on May 30, 1995, asking for a reply. On June 15, 1995, Peter Swan, Assistant to the President for Legal Affairs at the University, responded and listed defendant's criteria for plaintiff's return to work, again stating defendant's need for a release from plaintiff's doctor clearing plaintiff to work full time. As stated by Swan, the doctors' clearance should include a determination that plaintiff

> "is not a disabled person or that she is a disabled person who is not a threat to others and needs no accommodation, or that she is a disabled person who is not a threat to others and who can be accommodated without altering the essential functions of her job * * *."

On June 23, 1995, plaintiff replied, again voicing concerns that some of the conditions for plaintiff's return to work were unreasonable.[7] On July 20, 1995, Swan responded that defendant needed the releases from plaintiff's doctors before August 2, 1995, or it would be forced to replace plaintiff.

---

[6] All plaintiff's correspondence with defendant and defendant's agents was through her attorney. Because plaintiff contends that her correspondence with defendant over the period between May 15, 1995, and January 29, 1996, provided defendant with notice of her claim for IIED in accordance with ORS 30.275, we discuss that correspondence in detail.

[7] The correspondence between plaintiff and defendant also discussed various documents that plaintiff sought from defendant in order to pursue her goal of returning to work under conditions amenable to her current needs. We relate only those aspects of the correspondence pertinent to the issues raised by plaintiff's claims.

In a letter dated September 18, 1995, plaintiff enclosed letters from plaintiff's doctors releasing her to work full time, but not in the Housing Department. Plaintiff's letter stated:

> "Given the fact that Dr. Cordes believes that Ms. Flug can return to work full-time so long as certain stressors can be eliminated, it is our position that Ms. Flug is able to return to work so long as the University can accommodate her illness by transferring her to another department.
>
> "* * * * *
>
> "Dr. McPherson believes that returning Ms. Flug to her job in the Housing Department is contraindicated in light of Ms. Flug's severe depression. On the other hand, both Dr. McPherson and Dr. Co[r]des are of the opinion that it is important to Ms. Flug's treatment and recovery that she return to work. Given the size and breadth of the University's staff, it is our position that the University can accommodate the restriction prescribed by Dr. Cordes and Dr. McPherson by transferring Ms. Flug to another department.
>
> *"Please consider this our formal request that the University accommodate Ms. Flug's illness by offering her suitable work in another department."*

(Emphasis added.) Plaintiff sent another letter on December 18, 1995, complaining that she had not yet received word from defendant regarding its willingness to make accommodations in her employment and stating that she had hoped to "reach an amicable resolution" without having to resort to litigation. Defendant responded on December 29, 1995, stating that, because it had not received the doctors' clearances by August 2, 1995, it had restructured the Housing Department to eliminate plaintiff's position. Defendant further stated that it believed that plaintiff was neither a disabled person nor an injured worker. Defendant suggested that plaintiff contact the University Employment Manager "in an effort to identify any forthcoming openings in her salary range which might interest her and for which her skills and training * * * would be appropriate." Defendant went on to state that if no such position were found, it eventually would need to remove plaintiff from Management Service.

Plaintiff's attorney responded by letter to Swan on January 29, 1996, writing:

"I regret that we have been unable to amicably resolve the University of Oregon's continual and repeated violations of Ms. Flug's rights as a disabled person under ORS 659.425 and 42 USC § 12102. We have provided you, as legal counsel for the University, with actual and continual notice of Ms. Flug's claim and of her desire that the University make reasonable accommodations for her disability.

"Certainly, as our prior correspondence makes clear, Ms. Flug is a disabled person. As you are aware, Ms. Flug suffers from a psychological disorder, which, at a minimum, substantially limits her ability to communicate and socialize. As Ms. Flug's employer, the University of Oregon has been requested to reasonably accommodate her disability by transferring her to another department. However, the University has refused to provide this reasonable accommodation which would enable her to perform her job.

"Therefore, in order to redress the University's unlawful discrimination, Ms. Flug reserves the right to file suit against the University for its discrimination against her as a disabled person in employment, in violation of ORS 659.425 and 42 USC §12102. In the event we file such an action we will seek compensatory damages, back pay, reasonable attorney fees, an order of reinstatement, and other injunctive relief such as reasonable accommodation.

"Although we believe that our prior correspondence meets the requirements of ORS 30.275(6), you should consider this letter as formal notice of a claim under that statute."

On May 10, 1996, plaintiff filed a complaint alleging, *inter alia*, that she had become "temporarily disabled from performing her position due to an illness diagnosed as acute depression and anxiety" and that defendant had violated ORS 659.425 by discriminating against her because of that mental impairment. Plaintiff further alleged that defendant had discriminated against her in retaliation for her opposition to their unlawful employment practices and that, by "seeking to coerce [her] to obtain false medical releases and reports from her attending physician," defendant had intentionally caused plaintiff to suffer extreme emotional distress.

Defendant moved for summary judgment, contending that: (1) plaintiff had failed to give proper notice of her IIED claim under ORS 30.275; (2) even if plaintiff had given proper notice of her IIED claim, defendant's acts, as a matter of law, did not rise to the level of outrageous conduct necessary to support a claim for IIED; and (3) plaintiff was not entitled to state a claim under ORS 659.400 *et seq.* because she was not a "disabled person" under that statute nor, in the alternative, was she able to perform the essential functions of her job. In her reply in opposition to defendant's motion, plaintiff contended that the "discovery rule" applied to her IIED claim and that she

> "did not know, and had no way of knowing until after [the] * * * January 29, 1996 [letter] that Defendant had acted intentionally and knowingly to injure her rather than negligently or incompetently as she presumed."

(Emphasis deleted.) Plaintiff did not respond to or offer evidence to counter defendant's contentions about her status as a disabled person. The court granted defendant's motion in an order dated August 15, 1997. In the order, the court stated that plaintiff's notice of her IIED claim was untimely under ORS 30.275 and that she could not maintain her employment discrimination and retaliation claims under ORS chapter 659 for the reasons set forth in defendant's memorandum in support of its motion for summary judgment.[8]

On appeal, plaintiff contends that (1) there is a genuine issue of material fact whether her action was filed within 180 days of the time when she reasonably should have discovered the injury that was the basis of her IIED claim; (2) even if she should have discovered her injury earlier, the letters from her former attorneys to defendant constituted actual notice of her IIED claim; and (3) there is a genuine issue of material fact whether plaintiff is a disabled person and whether defendant violated state laws prohibiting discrimination against disabled persons.

---

[8] The trial court did not specify which of defendant's alternative arguments was successful. For purposes of this opinion, we assume that the court considered each alternative and determined that defendant prevailed under each of them.

Plaintiff's first and second assignments of error address the trial court's ruling that she failed to provide proper notice of her IIED claim as required by ORS 30:275. In its order granting summary judgment to defendant, the trial court stated:

"Plaintiff's Second Claim for Relief is for intentional infliction of an extreme emotional distress dating from May 10, 1995. The issues before the Court are necessarily framed by the pleadings, and in particular, Plaintiff's Second Amended Complaint. In that Complaint on page 2, lines 4-5, Plaintiff alleges: 'Plaintiff timely communicated notice of her claims under Oregon law pursuant to ORS 30.275 as follows: * * *' (emphasis added).[9] Plaintiff now in her response to the Motion for Summary Judgment as to this claim asserts that this action (and therefore this claim) was filed within 180 days of Plaintiff's discovery of the alleged tort. However, she is bound by her allegation of her Second Amended Complaint, and the Court's ruling is based upon those allegations." (Underscoring in original.)

As a preliminary matter, plaintiff asserts that the trial court erred when it refused to consider the question of whether the "discovery rule" applied to her complaint. Specifically, plaintiff argues that, once she had offered evidence to support her contention that she was not aware, and could not reasonably have been aware, of her injury until early 1996, the trial court was required to deem the pleadings as being amended to conform to that proof. Assuming that plaintiff is correct, we conclude, nevertheless, that the trial court did not err when it concluded that her notice was not timely.

First we address plaintiff's assertion in her second assignment of error that the correspondence between her former attorneys and defendant constituted actual notice of her claim under the statute. If plaintiff is correct in that assertion, we need not address the issue of when she should have "discovered" her injury. Under ORS 30.275(6), actual notice of claim is

---

[9] The text that the trial court omitted lists the correspondence between plaintiff and defendant from May 15, 1995, to January 26, 1996.

"any communication by which any individual to whom notice may be given as provided in subsection (5) of this section or any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to the claim, *where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body.*"

(Emphasis added.) Plaintiff concedes that none of the letters sent within 180 days of May 10, 1995, specifically mentions a claim for IIED. Nevertheless, plaintiff argues that the letters are sufficient because "the statute does not require any mention in the 'actual notice' of the specific tort or legal theory upon which any potential lawsuit will rest." (Emphasis deleted.) Accordingly, under plaintiff's theory, as long as the communications at issue provided defendant with notice that *some* claim was possible, then those communications were sufficient to provide notice of *any* claim. We disagree.

■■ As we explained in *Cameron v. State Dept. of Transportation*, 80 Or App 708, 723 P2d 378, *rev den* 302 Or 299 (1986), ORS 30.275(6) encompasses two requirements. First, the state must receive actual notice of the time, place, and circumstances giving rise to a plaintiff's claim. Second, the communication "in its entirety" must be such that "a reasonable person would conclude" that a particular person intends to assert a claim against the public body. *Id.* at 712 (citations and internal quotation marks omitted). Here, as in *Cameron*, the letters from plaintiff's attorneys apprised defendant of various circumstances on which plaintiff's IIED claim is based. Nothing in those letters indicates, however, that plaintiff intended to assert an IIED claim against defendants based on those circumstances.

■■ Nor does it assist plaintiff that, as defendant concedes, the letters constituted actual notice of plaintiff's claim for employment discrimination. The purpose of the notice requirement of ORS 30.275 is to allow the public body an opportunity to investigate a matter promptly and to settle all meritorious claims without litigation. *Robinson v. Shipley*, 64 Or App 794, 797, 669 P2d 1169, *rev den* 296 Or 138 (1983). Where a communication relates to a variety of circumstances

and events but indicates a person's intent to assert a claim only as to some, but not all, of them, the public body is not sufficiently apprised of the need to investigate those circumstances and events as to which no intention to assert a claim has been communicated. Again, nothing in the lengthy correspondence between plaintiff's former attorneys and defendant indicated, even remotely, that plaintiff intended to assert an IIED or other claim against defendant based on the circumstances ultimately relied on by petitioner in asserting that claim.

■       Plaintiff also claims, however, that she could not give actual notice of her IIED claim within 180 days of May 10, 1995, because she was not aware that she had such a claim until some time after January 29, 1996. Specifically, plaintiff argues that her notice was timely because she filed her complaint within 180 days of "discovering" her injury.[10]

■       ORS 30.275 requires that notice of a claim be given within 180 days after the alleged loss or injury. Under the discovery rule, a claim does not accrue, and the time period in which notice must be given does not begin to run, until the plaintiff discovers, or reasonably should have discovered, (1) her injury; (2) the cause of the injury; and (3) the identity of the tortfeasor. *Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 161-62, 742 P2d 1176 (1987). Here, there is no dispute that plaintiff knew of her injury—emotional distress; its cause—the meeting with her supervisors in which they demanded an unconditional release from her doctors; and the identity of the tortfeasors—her supervisors and, by extension, defendant. Plaintiff nevertheless argues that, because she was unaware of the fact that her supervisors had been in contact with her doctors before the May 10 meeting, she was unaware of her supervisors' level of culpability when they acted as they did at the time of the meeting. In other words, although plaintiff knew that she had suffered emotional distress as a result of her supervisors' actions at the meeting, she assumed that those actions were the result of negligence

---

[10] Defendant does not dispute that commencement of an action by or on behalf of the claimant within the applicable time period satisfies the statutory notice requirement. ORS 30.275(3)(c).

on their part. Plaintiff contends that Oregon does not recognize a claim for negligent infliction of emotional distress and, therefore, anything she knew before January 29, 1996, could not support a claim against defendant. Accordingly, her claim for *intentional* infliction of emotional distress had not yet accrued. That claim began to accrue, according to plaintiff, some time after January 29, 1996, when she learned of the communications between her supervisors and her doctors and, only then, realized that

> "the whole purpose of the May 10 memo and meeting had been to cause [her] to become so upset and frightened about losing [her] job that [she] would either agree to return to fulltime work against [her] doctors' advice, or accept the alternative of 'resigning' to receive disability insurance benefits. In other words, they deliberately and intentionally caused [her] to suffer extreme emotional distress , hoping to avoid liability for firing [her] because of [her] illness."

Defendant responds that the tortfeasor's level of culpability is not a necessary element for a cause of action to accrue. Defendant quotes *Duyck* for the proposition that accrual of a negligence claim does not require awareness of negligence but, rather, occurs with the knowledge of the facts giving rise to the claim. 304 Or at 164. There is language in *Duyck*, however, that may be read to mean that when *intent* is a necessary element of the claim, the claim does not accrue until that intent is known. 304 Or at 162, 163 (whether defendant was at "fault" might have been a key factor in determining accrual of a deceit claim).[11] Assuming for the

---

[11] We note, however, that in *Gaston v. Parsons*, 318 Or 247, 864 P2d 1319 (1994), the Supreme Court stated:

> "Although 'tortious conduct' is an element of injury under the discovery rule, a plaintiff does not need to identify a particular theory of recovery before the statute of limitations begins to run. All that is required is that the plaintiff discover that some invasion of the legally protected interest at stake has occurred. *For example, when a plaintiff discovers that he or she has wrongfully been harmed by the conduct of another, he or she need not further discover whether the defendant's act was intentional or negligent for the statute of limitations to begin to run.* Discovery that the plaintiff's legally protected interest to be free from * * * harm at the hands of another had been infringed is sufficient to satisfy the tortious conduct element of the discovery rule."

318 Or at 255 n 8 (emphasis added). The court went on to say, however, that the word "injury," in the context of the requirement that a plaintiff know of his or her injury before the statute of limitations will begin to run, refers to a "legally cognizable harm." If plaintiff would not suffer a legally cognizable harm unless defen-

sake of argument that that is the case, the evidence, even when viewed in the light most favorable to plaintiff, shows that as of May 10, 1995, plaintiff was aware of some facts that supported her theory that defendant intended to cause her emotional distress.

At the May 10 meeting, plaintiff's supervisors informed her that, as a condition for her return to work, she must provide them with a full release from her doctors. In her affidavit attached to her response to defendant's motion for summary judgment, plaintiff states

> "I was flabbergasted, because [the memo] told me (and they both confirmed verbally) that I would be fired unless I immediately presented them with releases from my doctors to resume full time work with no restrictions or accommodations to my illness or recovery process. I told them that what they were demanding was impossible, because my doctors had not yet released me to resume my duties full time. They again insisted that I obtain the signatures of both of my doctors on a fulltime work release. I again said that they would not do that, and asked them directly whether they were ordering me to have my doctors lie about their medical opinions. They would not answer that question. I was very hurt and upset by their statements and attitude at the meeting and the contents of the memo * * *."

It is clear from plaintiff's affidavit that she understood at the time of the meeting that her supervisors were demanding that she produce a medical release that she could not obtain. When she told them that she could not obtain the release, they continued to demand that she do so in order to continue her employment with defendant. In her brief to this court, plaintiff contends that, because she did not know of her supervisors' communication with her doctors, she did not know that her supervisors knew that "this 'option' they offered her would either be impossible, or require her to induce her physicians to lie in writing as to their prognoses for her recovery." Plaintiff's own affidavit disproves that

---

dant acted intentionally, then, we assume, the limitations period would not begin to run until plaintiff was aware of defendant's intent. Because we conclude that, as of the meeting on May 10, 1995, plaintiff was sufficiently aware of defendant's alleged intent to cause her emotional distress for the notice limitation period to run, we need not resolve in this case any possible inconsistencies between *Duych* and *Gaston*.

statement—she states that she told her supervisors that they were asking her to have her doctors lie about their medical opinions and further states that they continued to press her with the demand after she had told them it was impossible. Thus, by her own account, plaintiff was sufficiently aware of facts necessary to raise an issue about whether her supervisors were acting intentionally when they asked her to provide false reports and, thereby, caused her to suffer emotional distress. Although her discovery of her supervisors' communication with her doctors may have been relevant at trial as further evidence of their alleged intent to harm her, her IIED claim was not dependent on that discovery. As of May 10, 1995, plaintiff had sufficient information to raise an issue of fact on each element of her IIED claim, and her cause of action therefore accrued on that date. Accordingly, the trial court did not err when it concluded that her notice was untimely.

■    In her last assignment of error, plaintiff contends that the trial court erred when it granted defendant's motion for summary judgment as to the unlawful employment practices claims. As we have already noted, 170 Or App at 669 n 8, in granting defendant's motion the trial court did not specify which alternative argument it found persuasive. We assume for the purpose of this opinion that the court concluded that the evidence in the summary judgment record proved that plaintiff was not disabled and further concluded that, even if plaintiff *were* disabled, the undisputed facts demonstrated that her disability could not reasonably be accommodated.

In her complaint, plaintiff alleged that "[o]n approximately April 13, 1995, [she] became temporarily disabled from performing her position due to an illness diagnosed as acute depression and anxiety." Defendant, citing an administrative rule discussing short-term mental impairments, argues that plaintiff has pled herself out of an employment discrimination claim.[12] We need not decide whether defendant is correct on that point because, even if there were a triable issue of fact about whether plaintiff was disabled or was

---

[12] The rule cited by defendant provides, in pertinent part, that

"[s]hort-term * * * mental impairments leaving no residual disability or impairment are not handicaps within the meaning of the statute and these

affected by only a short-term mental impairment, we conclude that there was not a triable issue of fact about whether defendant could have reasonably accommodated plaintiff's disability.

On the latter point, defendant contends that, even if plaintiff is a disabled person, she could not perform the essential functions of her job and, therefore, is not entitled to protection under ORS 659.425. Specifically, defendant argues that, without the full medical release from plaintiff's physicians stating that plaintiff was not a danger to herself or others, it could not be assured that plaintiff could "perform the essential functions of the job safely and efficiently" with reasonable accommodation. *See* OAR 839-06-225 (requiring that disabled employees be capable of performing employee duties to be entitled to statutory protection).[13] Defendant further argues that, when it did not receive that release by August 2, 1995, it was within its rights to restructure the Housing Office and eliminate plaintiff's position because otherwise it would have suffered undue hardship. OAR 839-06-245(2). Finally, defendant argues that, once plaintiff had informed it that her doctors opposed her return to work in the Housing Office, and because there were no other supervisory-level job openings available at that time, it fulfilled any remaining obligation it had to accommodate plaintiff when it instructed her to contact the University Employment Manager in order to identify any forthcoming openings in her salary range for which her skills and training would be appropriate.

We need not decide whether it was unreasonable for defendant to demand that plaintiff deliver a full medical release before she would be allowed to return to work in the

---

rules[, but] * * * conditions which are controllable by * * * drug therapy, psycho therapy, or other medical means [are disabilities] * * *."

OAR 839-06-240. The various administrative rules implementing the statutory anti-discrimination policies have been, to a certain degree, amended and renumbered since the events at issue in this case. All references to administrative rules in this opinion are to the versions in effect at the time those events occurred.

[13] The Bureau of Labor and Industries has promulgated rules developing and explaining the concept of "reasonable accommodation." The legislative history of the anti-discrimination statutes indicates that the legislature chose to leave development of the concept to the department in its administrative rules. *Braun v. American International Health*, 315 Or 460, 472, 846 P2d 1151 (1993).

Housing Department. Nor need we decide whether it would have caused defendant undue hardship to leave the Housing Department position open for plaintiff. The medical release that plaintiff eventually delivered to defendant clearly indicated that plaintiff's doctors believed that plaintiff was unable to perform the essential functions of her job in that department. However, the question remains whether, given that restriction by plaintiff's doctors, defendant was required to do anything more to fulfill its obligation under ORS 659.425.

In the letter in which plaintiff informed defendant that her doctors would not release her to work in the Housing Department, plaintiff's attorney also wrote:

*"Given the size and breadth of the University's staff, it is our position that the University can accommodate the restriction prescribed by Dr. Cordes and Dr. McPherson by transferring [plaintiff] to another department."*

(Emphasis added.) OAR 839-06-245 was the administrative rule regarding "reasonable accommodation" that was in effect at the time of plaintiff's discharge. That rule provided, in pertinent part:

"ORS 659.425 imposes an affirmative duty upon an employer to make reasonable accommodation for an individual's physical or mental impairment where the accommodation will enable that individual to perform the work involved *in the position occupied* or sought:

"(1)  *Accommodation is a modification or change in one or more of the aspects or characteristics of a position* including but not limited to:

"(a)  Location and physical surroundings;

"(b)  Job duties;

"(c)  Equipment used;

"(d)  Hours, including but not limited to:

"(A)  Continuity (extended breaks, split shifts, medically essential rest periods, treatment periods, etc.); and

"(B)  Total time required (part-time, job-sharing).

"(e) Method or procedure by which the work is performed.

"(2) Accommodation is required where it does not impose an undue hardship on the employer.

"\* \* \* \* \*

"(3) *A handicapped person who is an employee* \* \* \* *must cooperate with an employer in the employer's efforts to reasonably accommodate the person's impairment.* A handicapped person may propose specific accommodations to the employer, but an employer is not required to accept any accommodation which imposes an undue hardship. Nor is the employer required to offer the accommodation most desirable to the handicapped person \* \* \*."

(Emphasis added.) Neither the text of the rule, nor of the statute that the rule implements, indicates that "reasonable accommodation" includes finding a new job for an employee who, because of a disability, can no longer perform the job for which she was hired. This contrasts with ORS 659.420(1), which provides:

"A worker who has sustained a compensable injury and is disabled from performing the duties of the worker's former regular employment shall, upon demand, be reemployed by the worker's employer at employment which is available and suitable."[14]

Thus, it is arguable that under ORS 659.425, unlike ORS 659.420, an employer has no obligation to offer other employment to a disabled employee who, because of her disability, can no longer perform the duties of her former employment. We need not decide whether that is the proper interpretation of the statutory and regulatory language, however, because even if we were to decide that "reasonable accommodation" as required by ORS 659.425 imposes the same affirmative duty imposed by ORS 659.420, we conclude that, in this case, defendant did all that is required by that duty.

In *Blumhagen v. Clackamas County*, 91 Or App 510, 756 P2d 650, *rev den* 306 Or 527 (1988), we discussed the extent of an employer's affirmative duty under ORS 659.420.

---

[14] The current version of ORS 659.420 is the same as that in effect at the time of the events at issue in this case.

In that case, the injured plaintiff had argued that her employer had violated ORS 659.420 because there was a substantial difference in salary, duties and responsibilities between her former position and the position offered her after her injury. Relying on our opinion in *Carney v. Guard Publishing Co.*, 48 Or App 147, 152, 616 P2d 548, *on recons* 48 Or App 927, 630 P2d 867, *rev den* 290 Or 171 (1980), we concluded that ORS 659.420

"does not demand that an employer create positions or substitute an injured employe[e] for a non-injured one. Neither is an employer obligated to offer a selection of equally suitable jobs or hold its offer open for an unreasonable period of time."

*Blumhagen*, 91 Or App at 514. Because there were no available positions comparable to the plaintiff's former job, we concluded that the employer complied with its statutory duty when it offered the plaintiff the lower-paying position. *Id.* at 515.

In this case, defendant avers, and plaintiff does not dispute, that at the time plaintiff demanded a transfer there were no comparable positions open. Defendant invited plaintiff to contact its Employment Manager to identify forthcoming job openings that might be suitable. Plaintiff did not respond to that invitation. Even if we are to assume that ORS 659.425 contains an obligation equivalent to that found in ORS 659.420, we conclude that, under *Blumhagen*, defendant here discharged that obligation when it informed plaintiff that, although there were no comparable (managerial) jobs available, she should contact the personnel office to determine whether there might be a position open in the future for which she was qualified or whether there was a current opening that might be of lesser responsibility (and lesser salary) that she might want. Pursuant to OAR 839-06-245(3), the disabled employee must cooperate with the employer's efforts to accommodate the employee. Because plaintiff did not respond to defendant's suggestion that she contact the personnel office, there is no way of knowing if she would have obtained another, nonmanagerial, position. Consequently, defendant had no further obligation toward plaintiff—she was unable to perform the duties of the position for

which she was hired, there were no comparable positions to which she could be transferred, and she did not cooperate with defendant's attempt to identify any other position for which she might be qualified. Accordingly, defendant fulfilled any obligation that may have been imposed upon it by ORS 659.425 and summary judgment on plaintiff's unlawful employment practices claim was appropriate.

Finally, plaintiff asserts that the trial court erred when it granted defendant summary judgment on plaintiff's retaliation claim. In her second amended complaint, plaintiff alleged that, beginning on or about May 15, 1995, defendant retaliated against her for her opposition to what she perceived as unlawful employment practices.[15]

■■ Defendant moved for summary judgment on the discrimination and retaliation claims without distinguishing between the two. Its argument focused only on whether there were triable issues of fact on plaintiff's claim that defendant had violated ORS 659.425 by discriminating against her because of a disability. That focus is too narrow, because a plaintiff can prevail on a retaliation claim by establishing that the defendant retaliated against her for opposing claimed discriminatory practices even if the practices were not, in fact, discriminatory.[16] However, plaintiff did not argue to the trial court that the retaliation claim should be analyzed separately from the discrimination claim. She presented arguments that were directed solely to the existence of disputed issues of fact on the discrimination claim. In light of that focus, we conclude that she has not preserved her argument that the court erred in granting summary judgment to defendant on her retaliation claim independently of

---

[15] ORS 659.030(1)(f) provides that it is an unlawful employment practice for an employer

"to discharge, expel or otherwise discriminate against any person because the person has opposed any practices forbidden by this section, ORS 30.670, 30.685, 659.033 and 659.400 to 659.460, or because the person has filed a complaint, testified or assisted in any proceeding under ORS 659.010 to 659.110 and 659.400 to 659.545 or has attempted to do so."

[16] *See, e.g.*, *City of Portland v. Bureau of Labor and Ind.*, 61 Or App 182, 656 P2d 353 (1982), *on recons* 64 Or App 341, 668 P2d 433 (1983) (worker who failed to prove gender discrimination was nevertheless able to prove that employer had retaliated against her for making discrimination claim), *aff'd on retaliation claim and rev'd on discrimination claim* 298 Or 104, 690 P2d 475 (1984).

any claimed error in granting summary judgment on her discrimination claim. We therefore affirm the dismissal of the retaliation claim.

Affirmed.