Argued and submitted September 5, 2002, decision of Court of Appeals and
judgment of circuit court affirmed July 31, 2003

Deborah J. FLUG,
*Petitioner on Review,*

*v.*

UNIVERSITY OF OREGON,
*Respondent on Review.*

(CC 16-96-04247; CA A99397; SC S48434)

73 P3d 917

David C. Force, Eugene, argued the cause and filed the brief for petitioner on review.

Richard D. Wasserman, Assistant Attorney General, Salem, argued the cause for respondent on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

James S. Coon, of Swanson, Thomas & Coon, Portland, filed a brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

GILLETTE, J.

** Leeson, J., resigned January 31, 2003, and did not participate in the decision of this case.

### GILLETTE, J.

Plaintiff brought this action against her former employer, the University of Oregon (defendant), alleging two counts of unlawful employment practices under ORS chapter 659 and one count of intentional infliction of emotional distress (IIED). The trial court granted summary judgment for defendant, concluding, *inter alia*, that plaintiff had failed to give timely notice of her IIED claim, as ORS 30.275 requires.[1] The Court of Appeals affirmed, rejecting plaintiff's argument that certain letters that her lawyers had sent to defendant amounted to "actual notice" of her IIED claim within the meaning of ORS 30.275(6), set out below. *Flug v. University of Oregon*, 170 Or App 660, 13 P3d 544 (2000). We allowed plaintiff's petition for review and now affirm the decision of the Court of Appeals, albeit for slightly different reasons.

We draw the following facts from the record on summary judgment and present them, and all reasonable inferences that we draw from them, in the light most favorable to plaintiff. ORCP 47 C; *see also Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997) (stating and applying principle). In late August 1994, plaintiff took an extended medical leave from her job in the Housing Department of the University of Oregon because she was suffering from severe depression. In November 1994, plaintiff returned to work on a restricted basis. By April 1995, plaintiff was working about 25 hours per week.

On April 13, 1995, plaintiff's supervisors, Eyster and Tendick, learned that plaintiff had made certain comments

---

[1] ORS 30.275 is part of the Oregon Tort Claims Act and provides:

"(1) No action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 to 30.300 shall be maintained unless notice of claim is given as required by this section.

"(2) Notice of claim shall be given within the following applicable period of time, not including the period, not exceeding 90 days, during which the person injured is unable to give the notice because of the injury or because of minority, incompetency or other incapacity:

"(a) For wrongful death, within one year after the alleged loss or injury.

"(b) For all other claims, within 180 days after the alleged loss or injury."

to her coworkers that raised concerns that plaintiff might harm others.[2] Eyster and Tendick immediately placed plaintiff on administrative leave. On May 10, Eyster and Tendick met with plaintiff and presented her with a memorandum outlining her options with respect to her employment at the University. According to the memorandum, plaintiff's first option was to resign, effective June 30, 1995. A second option—returning to work—was available only if plaintiff met certain conditions. One condition was that she obtain a full release from her doctor and therapist to work "full time and * * * perform all job functions." The supervisors instructed plaintiff to inform them of her decision by May 15, 1995.

Plaintiff understood the memorandum as requiring her to present the requested medical releases by May 15. She told Eyster and Tendick that she could not meet that requirement because her doctors had not released her to work full time. Eyster and Tendick repeated their demand for a full release. Plaintiff then asked Eyster and Tendick if they were asking her to ask her doctors to lie. Eyster and Tendick did not respond.

Plaintiff was distressed by the meeting with Eyster and Tendick; she retained a lawyer to represent her in the matter. On May 15, 1995, plaintiff's lawyer wrote to Tendick that plaintiff chose option 2 (returning to work), but that "some modifications" in the conditions stated in the memorandum would be required. The lawyer specifically noted that the requirement that plaintiff obtain a full release from her doctors "is almost certainly a violation of federal and state law prohibiting discrimination against employees with handicaps." Plaintiff's lawyer suggested an informal meeting to "iron out" that and other concerns. The lawyer also requested a copy of plaintiff's personnel file.

Tendick sent the lawyer's letter to defendant's legal counsel, Swan. Swan responded to plaintiff's lawyer in a letter dated June 15, 1995, confirming that defendant needed

---

[2] Plaintiff reportedly told one coworker that she could understand the feelings of postal workers—an apparent reference to nationally publicized incidents in which postal workers had violently attacked their coworkers and supervisors. Plaintiff allegedly also described her shooting prowess to several coworkers.

releases from plaintiff's doctors before she could return to work.

Plaintiff's lawyer and Swan communicated by letter on various occasions thereafter, in an apparent attempt to negotiate the conditions of plaintiff's return to work. On July 20, 1995, Swan wrote to plaintiff's lawyer that defendant must have the requested releases by August 2, 1995, "or else the Housing Department will have no choice but to replace [plaintiff]." On September 18, 1995, plaintiff's lawyer sent defendant copies of plaintiff's doctors' responses to defendant's request for releases. The responses stated that plaintiff should not return to her position in the Housing Department, but suggested that she could work full time in a different, less stressful position. Based on those responses, plaintiff's lawyer asked defendant to accommodate plaintiff's mental disability by transferring her to a different department. Defendant refused to accede to that request and, instead, indicated that plaintiff's job no longer existed. Plaintiff's lawyer then informed Swan, by a certified letter dated January 29, 1996, that plaintiff was reserving the right to file an action against defendant "for its discrimination against her as a disabled person in employment, in violation of ORS 659.425 and 42 USC § 12102." The letter added that, "although we believe that our prior correspondence meets the requirements of ORS 30.275(6), you should consider this letter as formal notice of a claim under that statute."

On May 10, 1996, plaintiff filed a complaint against defendant. The complaint alleged that: (1) plaintiff suffered from a temporary disability (mental depression) that was susceptible to reasonable accommodation; (2) on May 10, 1995, defendant had demanded that plaintiff either resign from her position or obtain a written statement from her treating physicians "falsely stating" that she could return to work full time and perform all work functions; (3) plaintiff had responded by asserting her rights under ORS 659.425 (1995); and (4) defendant subsequently had refused to accommodate her disability and ultimately had discharged plaintiff from her position. Based on the foregoing facts, the complaint alleged two counts of unlawful employment practices under ORS 659.121 (1995) (providing for civil action for persons

aggrieved by certain specified unlawful employment practices) and one count of IIED. The first unlawful employment practice count alleged that defendant had violated ORS 659.425 (1995) by discharging plaintiff and discriminating against her in the terms, conditions, and privileges of employment because of her disability.[3] The second unlawful employment practice count alleged that defendant had violated ORS 659.030 by retaliating against plaintiff for opposing defendant's unlawful discrimination.[4] Plaintiff's claim for IIED was based on the theory that Eyster's and Tendick's conduct at the May 10, 1995, meeting was beyond the bounds of socially tolerable behavior and had caused plaintiff great emotional distress.

Defendant moved for summary judgment, arguing that plaintiff could not establish any genuine issue of material fact with respect to certain elements of her two statutory claims. Defendant also sought summary judgment on the IIED claim on the ground that plaintiff had failed to give notice of that claim within 180 days of her alleged injury, as ORS 30.275(2)(b) required. The trial court accepted defendant's arguments respecting all three claims and granted the motion.

---

[3] ORS 659.425(1) (1995) provided:

"For the purposes of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment because:

"(a) An individual has a physical or mental impairment which, with reasonable accommodation by the employer, does not prevent the performance of the work involved;

"(b) An individual has a record of a physical or mental impairment; or

"(c) An individual is regarded as having a physical or mental impairment."

ORS 659.425 was amended extensively in 1997. Or Laws 1997, ch 854, § 13.

[4] ORS 659.030 (1995) provided, in part:

"(1) For the purposes of ORS 659.010 to 659.110, 659.227, 659.330, 659.340 and 659.400 to 659.545, it is an unlawful employment practice:

"* * * * *

"(f) For any employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because the person has opposed any practices forbidden by this section * * * and [ORS] 659.400 to 659.460 * * *."

Plaintiff appealed. With respect to the IIED claim, plaintiff argued that she had provided timely notice of her claim under two alternative theories. She argued, first, that the 180-day notice period specified in ORS 30.275(2)(b) did not begin to run until a few weeks before she filed her action, when she discovered that, at the May 10, 1995, meeting, Tendick and Eyster intentionally were inflicting emotional distress on her.[5] Plaintiff argued that she satisfied the notice-of-claim requirement by commencing her action within 180 days of that discovery.[6]

In the alternative, plaintiff argued that three letters that her lawyer had sent to defendant's legal counsel within 180 days of the May 10, 1995, meeting provided "actual notice" of her IIED claim within the meaning of ORS 30.275(6).[7] Plaintiff acknowledged that those letters did not mention specifically the possibility of an IIED claim, but argued that references to the May 10, 1995, meeting and to defendant's possible statutory violations satisfied the notice of claim requirement with respect to her claim.

With respect to the statutory unlawful employment practices claims, plaintiff argued generally that there remained genuine issues of material fact respecting whether defendant had discriminated or retaliated against her.

---

[5] The discovery that plaintiff says led to that conclusion was that, at the time of the May 10, 1995, meeting, Tendick and Eyster had a letter from her doctor in hand that indicated that he would not release plaintiff to work full-time for at least another few weeks.

[6] ORS 30.275(3)(c) provides:

"Notice of claim required by this section is satisfied by

"* * * * *

"(c) Commencement of an action on the claim by or on behalf of the claimant within the applicable period of time provided in subsection (2) of this section."

[7] ORS 30.275(6) provides, in part:

"Actual notice of claim is any communication by which any individual to whom notice may be given * * * or any person responsible for administering tort claims on behalf of the public body acquires actual knowledge of the time, place and circumstances giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body or an officer, employee or agent of the public body."

The Court of Appeals affirmed the trial court's order. The Court of Appeals rejected plaintiff's discovery argument on the ground that plaintiff's own affidavit established that she was "sufficiently aware of facts necessary to raise an issue about whether her supervisors were acting intentionally when they asked her to provide false reports." *Id.* at 675. The court also rejected plaintiff's contention that the letters that her lawyer sent to defendant qualified as "actual notice" of her IIED claim for purposes of ORS 30.275(6). The court acknowledged defendant's concession that the letters constituted actual notice of plaintiff's claim for employment discrimination, but noted that the letters nowhere suggested an intent to assert a claim for IIED. *Id.* at 671-72.

With respect to plaintiff's employment discrimination claim, the Court of Appeals agreed with the trial court that there was no triable issue of fact as to whether defendant had made reasonable efforts to accommodate plaintiff's disability. *Id.* at 679-80. The Court of Appeals further concluded that plaintiff had failed to preserve her separate argument with respect to the retaliation claim. *Id.* at 680-81. Ultimately, the Court of Appeals affirmed the trial court's grant of summary judgment with respect to all plaintiff's claims. *Id.* at 681.

In her petition to this court, plaintiff suggests, as she did in the Court of Appeals, that her notice of claim was accomplished by commencing the present action: That notice was timely, she asserts, because it occurred within 180 days of her discovery that, a few days before the May 10, 1995, meeting, her physician had informed Tendick by letter that plaintiff should not return to work on a full-time basis for another few weeks. Plaintiff contends that that information revealed to her, for the first time, that Tendick and Eyster understood that she could not obtain immediate full releases from her doctors and that their purpose in demanding such releases was to cause her emotional distress.[8] Plaintiff

---

[8] In the Court of Appeals, plaintiff pointed to her affidavit, submitted in response to defendant's motion for summary judgment, which explained her perception of Tendick's and Eyster's motives:

"At the meeting on May 10 I was very confused, because my requests that Mr. Eyster or Mr. Tendick simply call my doctors to confirm what I was telling them, were ignored. I knew that Mr. Tendick was not a very competent

argues that her claim did not accrue, and the notice period did not begin to run, until she discovered that Tendick's and Eyster's conduct was intentional, *i.e.*, tortious.

The Court of Appeals concluded that plaintiff's discovery argument was undermined by her own summary judgment affidavit:

> "In her brief to this court, plaintiff contends that, because she did not know of her supervisors' communication with her doctors, she did not know that her supervisors knew that 'this "option" they offered her would either be impossible, or require her to induce her physicians to lie in writing as to their prognoses for her recovery.' Plaintiff's own affidavit disproves that statement—she states that she told her supervisors that they were asking her to have her doctors lie about their medical opinions and further states that they continued to press her with the demand after she had told them it was impossible. Thus, by her own account, plaintiff was sufficiently aware of facts necessary to raise an issue about whether her supervisors were acting intentionally when they asked her to provide false reports and, thereby, caused her to suffer emotional distress."

*Flug*, 170 Or App at 674-75.

Plaintiff argues that the Court of Appeals' analysis utilizes an erroneous standard of review, *i.e.*, it does not view the evidence, and all reasonable inferences, in her favor as the nonmoving party. Plaintiff points to her own sworn statement that she did not discover the intentional nature of defendant's conduct until long after the May 10, 1995, meeting. She also asserts that the Court of Appeals could not infer, from the fact that she repeatedly *told* Tendick and Eyster during the meeting that they were asking for the

---

manager and lots of things were over his head, but at that time I did not realize that he and Mr. Eyster had developed the conditions in the May 10 memo based on their actual knowledge that I could not comply with them because they had already talked to my doctor. Months later, * * * we learned of the existence of the telephone conversation between Tendick and Dr. Cordes and her confirming letter. * * * It then became clear that the whole purpose of the May 10 memo and meeting had been to cause me to become so upset and frightened about losing my job that I would either agree to return to fulltime work against my doctors' advice, or accept the alternative of 'resigning' to receive disability insurance benefits."

impossible, that she must have known that they *understood* that they were asking for the impossible.

■    In so arguing, plaintiff demonstrates that she does not fully understand the requirement of ORS 30.275(2)(b). That statute requires that the requisite notice be given "within 180 days after the alleged loss or injury." Thus, under the specific wording of the statute, our focus on summary judgment is not on whether, on May 10, 1995, plaintiff had actual knowledge that Tendick and Eyster already had heard from her doctors. It is sufficient that plaintiff knew or should have known facts that would indicate to a reasonable person that Tendick and Eyster had caused a loss or injury to her at the meeting on May 10, 1995. In that respect it is true, as the Court of Appeals held, that plaintiff's own affidavit affirmatively showed that she had been injured by intentional acts of Tendick and Eyster. That was enough to commence the 180-day statutory period. *See, e.g., Adams v. Oregon State Police*, 289 Or 233, 238-39, 611 P2d 1153 (1980) (in negligence action for damage to towed automobile, statutory notice began at point when plaintiff had reasonable opportunity to discover his injury and identity of party responsible for that injury).

Plaintiff's affidavit describes her repeated protests to Tendick and Eyster that they were demanding the impossible, and their intransigence in the face of those protests. Under that description of the meeting, Tendick's and Eyster's demands at the May 10, 1995, meeting caused plaintiff distress. There is nothing in this record to suggest that Tendick and Eyster could not understand what plaintiff was telling them face-to-face. Plaintiff's argument about her subjective uncertainty as to whether she was understood cannot create a factual issue with respect to that question. It follows that there was no issue of material fact respecting whether plaintiff suffered a loss or injury on May 10, 1995. Plaintiff's notice of claim was due within 180 days of that date.

■    Plaintiff argues, in the alternative, that three letters that her lawyer sent to defendant within 180 days of the May 10 meeting qualified as "actual notice" of her IIED claim.[9]

---

[9] In her complaint, plaintiff indicated that she timely had communicated notice of claim in *five* letters from her lawyer to defendant's representatives. However, two of the letters were sent more than 180 days after the May 10, 1995, meeting.

"Actual notice" is one way of satisfying the Oregon Tort Claim Act's (OTCA's) notice of claim requirement. ORS 30.275(3)(b). "Actual notice" is a communication by which a responsible person "acquires actual knowledge of the time, place and circumstances giving rise to the claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert a claim against the public body * * *." ORS 30.275(6).

The letters on which plaintiff relies were dated May 15, June 23, and September 18, 1995. The May 15 letter was addressed to Tendick. It stated that plaintiff rejected the first option listed in the May 10, 1995, memorandum (resignation) and chose option two (returning to work). The letter further stated that "some modifications" in the defendant's conditions would be required to accomplish plaintiff's return to work. In that regard, the letter specifically complained that defendant's requirement that plaintiff obtain a full release from her doctors before returning to work "is almost certainly a violation of federal and state law prohibiting discrimination against employees with handicaps." The letter closed by suggesting an informal meeting to "iron out" that and other concerns and by requesting a copy of plaintiff's personnel file.

Tendick sent the May 15, 1995, letter to Swan. Swan wrote a letter to plaintiff's lawyer on June 15, 1995, reiterating defendant's request for medical releases and explaining that request in terms of concerns about the "safety of others." In that letter, Swan noted that defendant would be reprimanding plaintiff for her "postal worker" comments and that a written "clarification" of expectations would be forthcoming.

Plaintiff's lawyer responded to Swan's June 15, 1995, letter in a letter dated June 23, 1995, which is the second letter on which plaintiff relies as actual notice of her IIED claim. In that letter, plaintiff's lawyer reiterated her request for a complete, unedited copy of plaintiff's personnel file and indicated that plaintiff needed to understand the exact nature of defendant's safety concerns to obtain the clearances that defendant was demanding. The lawyer expressed doubts about one item from defendant's proposed

"clarification" of expectations and asked Swan about the cancellation of plaintiff's health insurance and plaintiff's change of status to leave without pay.

Swan responded in writing on July 20, 1995. He explained the changes in plaintiff's status and health insurance and stated that defendant would not be supplying additional documentation. Swan also provided the clarification that plaintiff had requested respecting an unrelated matter and ended by stating that defendant must have the doctor's responses by August 2, 1995, "or else the Housing Department will have no choice but to replace [plaintiff]."

On September 18, 1995, plaintiff's lawyer sent the third letter on which plaintiff relies. In a letter to Swan, the lawyer stated that plaintiff's doctors would release plaintiff to work full time (but only in a different, less stressful position) and enclosed copies of the doctors' releases. The lawyer then requested that defendant "accommodate the restrictions prescribed by [plaintiff's doctors]" by transferring plaintiff to a different department.

As noted, plaintiff contends that a reasonable person would have understood the material quoted from her lawyer's letters as conveying an intent to file a statutory employment discrimination claim and that that expression of intent was sufficient. The Court of Appeals rejected that argument, holding that the letters were insufficient as notice of the IIED claim because they did not draw attention to any potential claim *for IIED*:

> "Where a communication relates to a variety of circumstances and events but indicates a person's intent to assert a claim only as to some, but not all, of them, the public body is not sufficiently apprised of the need to investigate those circumstances and events as to which no intention to assert a claim has been communicated. Again, nothing in the lengthy correspondence between plaintiff's former attorneys and defendant indicated, even remotely, that plaintiff intended to assert an IIED claim or other claim against defendant based on the circumstances ultimately relied on by petitioner in asserting that claim."

*Flug*, 170 Or App at 671-72.

Plaintiff argues that the Court of Appeals decision requires that a notice of claim specifically forecast each *legal theory* that a plaintiff ultimately intends to assert and that any such requirement is inconsistent with the wording and overall purpose of the notice statute. Plaintiff contends that the statute instead requires only that a plaintiff convey an intent to bring *some* claim and that a communication fulfills the purpose of the notice requirement (*i.e.*, providing the governmental defendant with an opportunity to investigate) if it describes the "time, place and circumstances" surrounding the claim and generally conveys an intent to sue.

Defendant disagrees with that analysis. Defendant notes, first, that the term "claim" appears to be used throughout the OTCA in its narrow, legal sense, *i.e.*, to refer to a specific cause of action or theory of recovery.[10] From that standpoint, defendant argues that the wording of ORS 30.275(6) assumes the circumstance in which the plaintiff intends to and does assert a single "claim" or cause of action. In defendant's view, the provision requires a responsible person to acquire "actual knowledge of the time, place and circumstances giving rise to *the* claim," *i.e.*, the specific theory of tort liability that the claimant intends to assert, and it also requires that a potential plaintiff communicate an intent to bring *a* claim, *i.e.*, an action on *that* specific theory of liability. Defendant contends that the use of the phrase "a claim" merely reflects the fact that the provision is couched in terms of a single claim and "in no way suggests that, when a claimant intends to press multiple claims in the same tort action, a tort claim notice mentioning only a general intent to sue would satisfy ORS 30.275(6)."

The parties' arguments present a question of statutory construction, which we address according to the framework set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). *PGE* directs us first to

---

[10] Defendant notes, for example, that ORS 30.275(2) sets out a one-year notice period for wrongful death and a 180-day period "for all other claims." Defendant also points to the fact that ORS 30.270(1) repeatedly uses the plural form, "claims," when discussing limits of liability to any one claimant for a single accident or occurrence. Defendant contends that that usage pattern establishes that, throughout ORS 30.275, "claim" always refers to a particular theory of liability in tort and not to the claimant's overall claim for relief.

consider the text and context of the statute, and to proceed to other levels of analysis only if the meaning of the statute remains unclear at that first level. *Id.* at 610-11.

■      The relevant part of ORS 30.275(6) defines "actual notice" of a claim as

"any communication by which any individual to whom notice may be given * * * acquires actual knowledge of the time, place and circumstances giving rise to *the* claim, where the communication is such that a reasonable person would conclude that a particular person intends to assert *a* claim against the public body or an officer, employee or agent of the public body."

(Emphasis added.) The provision consists of two clauses. The first clause refers to the recipient's actual knowledge of facts, *viz.*, "time, place and circumstances giving rise to" the claim. The second clause invokes an objective reasonableness standard by which the meaning of what is "actual[ly] know[n]" is to be tested. It also is significant, in our view, that the foregoing provision speaks in terms of communicating an intent to assert *a* claim against the public entity. The use of the indefinite article ("a") suggests that the notice need convey only an intent to assert *some* claim. That impression is bolstered by the fact that the same subsection spells out a requirement that the notice describe the "time, place and circumstances giving rise to *the* claim." (Emphasis added.) The clear import of the contrasting choice of articles is that, although a plaintiff must provide a defendant with the facts (*i.e.*, time, place, and circumstances) that relate to the specific claim or claims that a plaintiff ultimately asserts, the plaintiff need convey an intent to assert a claim only in general terms.

In sum, we see nothing in the wording of ORS 30.275(6), or in the context of other provisions relating to that statutory subsection, that suggests or supports defendant's argument that a notice of claim must predict expressly the specific claims that will or may be asserted. ORS 30.275(6) requires some form of communication by which the proper parties acquire actual knowledge of the time, place, and circumstances "giving rise to" the ultimate claim, not of the specific nature or theory of the claim. Although the notice also

must warn of the plaintiff's intent to bring "*a* claim," the use of that term demonstrates that that warning need not specify precisely *what* claim. The rule for which defendant argues (and that the Court of Appeals announced) thus is too stringent, and we reject it.

There is no need to inquire further into the meaning of ORS 30.275(6). It is clear from text and context that, for purposes of the OTCA notice of claim requirement, "actual notice" is a communication that (1) allows the recipient to acquire "actual knowledge of the time, place and circumstances" that give rise to the specific claim or claims that the plaintiff ultimately asserts; and (2) would lead a reasonable person to conclude that the plaintiff has a general intent to assert *a* claim. With that definition in mind, we return to the three letters that plaintiff advances as notice of claim.

We need not address whether the letters allowed defendant to acquire actual knowledge of the "time, place and circumstances," giving rise to plaintiff's IIED claim, because we conclude that the other requirement of the statute, *viz.,* communication of an intent to assert a claim, is dispositive. In that regard, there is no issue whether the letters communicated information that would cause a reasonable person to conclude that plaintiff intended to assert a claim against defendant. They did not. Although the letters stated that defendant's demand for doctors' releases was unlawful, and that other demands and conditions imposed by plaintiff's supervisors were unreasonable, the import of those statements merely is that plaintiff regarded that behavior as contrary to law or unfair, not that plaintiff intended to sue over those matters.

We reject each of plaintiff's theories as to how she fulfilled the notice of claim requirement of ORS 30.275 with respect to her IIED claim. The trial court did not err in granting summary judgment for defendant respecting that claim.[11]

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[11] Plaintiff advances other arguments respecting the notice requirement that we also conclude are not well taken. A more complete discussion of them is unnecessary. Plaintiff also advances a second claim of error that is entirely fact-specific. We decline to discuss the Court of Appeals' rationale concerning the issue.