Argued and submitted October 2, 2001, reversed and remanded October 15, 2003

Roger M. POLLOCK
and RMP Properties, Inc.,
nka KMP Properties, Inc.,
an Oregon corporation,
*Appellants,*

*v.*

D. R. HORTON, INC. - PORTLAND,
a Delaware corporation,
and D. R. Horton, Inc.,
a Delaware corporation,
*Respondents.*

9903-02825; A110606

77 P3d 1120

Gary M. Berne argued the cause for appellants. With him on the briefs were David F. Rees, and Stoll Stoll Berne Lokting & Shlachter, P. C.

Peter H. Glade argued the cause for respondents. With him on the brief were Paul Bierly and Markowitz, Herbold, Glade & Mehlhaf, P. C.

Before Wollheim, Presiding Judge, and Deits, Chief Judge, and Linder, Judge.*

DEITS, C. J.

---

* Linder, J., *vice* Warren, S. J.

**DEITS, C. J.**

Plaintiffs appeal a judgment entered after the trial court's grant of summary judgment to defendants on plaintiffs' claims for breach of contract and on defendants' counterclaims for breach of fiduciary duty, restitution, and breach of contract. We reverse.

Because the trial court granted defendants' motions for summary judgment, we state the facts in the record most favorably to plaintiffs, including drawing all reasonable inferences in their favor. ORCP 47 C; *Flug v. University of Oregon*, 335 Or 540, 542, 73 P3d 917 (2003); *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). Plaintiff Roger M. Pollock (Pollock) is the sole shareholder in plaintiff KMP Properties, Inc., formerly known as RMP Properties, Inc. (RMP). In 1990 RMP began building homes in the Portland area, focusing on the market for first-time buyers. It built homes on speculation, without having buyers for them, and then sold them after construction began, usually after completion. Such homes are known in the trade as "spec" homes, in contrast to "custom" homes, which are sold before being built. The business grew rapidly; by 1997 RMP was the largest builder of spec homes in the Portland area. In that year, it started 303 homes, sold 187, and had profits of over $3 million.

Pollock's goal was for RMP to continue its rapid growth, but he was uncertain whether it could do so on its own. By 1997, he was also concerned that changes in the local banking climate, particularly the purchase by a Minnesota bank of the bank that financed RMP's business—which was the last large locally owned bank in Oregon—would affect his ability to obtain the necessary financing. In addition, he was uncertain whether his and RMP's credit would be sufficient to obtain that financing from any other source. He therefore sought to sell RMP or its assets to a large regional or national homebuilder that would have the necessary resources to continue the business's growth. His goal was to remain in charge of the business after the sale and to participate in the benefits of its expansion. In order to find a purchaser, Pollock hired a

local investment banker, who prepared an offering memorandum and sent it to several interested companies. The memorandum described the nature of RMP's business, including its focus on spec homes.

Defendant D. R. Horton, Inc. (Horton), was one of the companies that received the offering memorandum. It expressed interest and eventually agreed with Pollock on the terms for it to purchase RMP's assets. Under the agreement, Horton would form D. R. Horton, Inc.-Portland (Horton-Portland) as a new subsidiary, and Horton-Portland would purchase the assets. It would pay Pollock $6.5 million in cash and $1.25 million in restricted Horton stock, and Pollock would become an officer of Horton-Portland, in charge of the division's operations. Horton told Pollock that it wanted to work with people who were entrepreneurs and who could operate by themselves with little interference from above. Pollock thus understood that the agreement contemplated that he would be free to run the business as he had always run it, with the only difference being that he would now receive a salary. Before closing the deal, Horton performed a thorough due diligence investigation that gave it the opportunity to become fully familiar with RMP's business, including its emphasis on spec homes, the turnover of its inventory, and the gross margins that it customarily obtained on its sales.

Pollock believed that the business was worth approximately $12 million rather than the $7.75 million in cash and stock that Horton-Portland paid at the closing. As a way to make up the difference, the "Asset Purchase Agreement" (APA), which was the primary document for implementing the purchase, provided a profit-sharing arrangement that it described as the "earn-out."[1] Under the earn-out, plaintiffs were entitled to receive 50 percent of the profit that Horton-Portland made above $3.75 million during the first three years after the closing and 50 percent of the profit above $4 million in the fourth year. Pollock intended to use the resources[2] that Horton would provide to expand the business rapidly, thereby making possible a level of production

---

[1] The APA expressly provides that the earn-out is additional consideration for the purchase, not compensation for Pollock's services.

[2] Those resources were partly access to necessary capital and partly lower costs resulting from Horton's greater bargaining power with suppliers.

and sales of houses that would make the earn-out extremely valuable. He thought that the earn-out could produce as much as twice as the amount that he would have received if he had sold the business outright at its current fair value. Pollock did not intend to change his previous business approach but, rather, to expand it by building and selling increased numbers of houses. Thus, he would continue his focus on a high volume of sales with relatively modest gross profit margins, and he would continue building spec rather than custom houses. The offering memorandum made clear that his fundamental purpose in selling the business was to obtain resources that he could use in that fashion.

The APA reflects the above considerations. Article 9 included a noncompetition provision that prevented Pollock and RMP from engaging in a competitive business for three years after the end of the earn-out period or three years after the termination of Pollock's employment, whichever came first. It also contained confidentiality and enforcement provisions. Among those provisions was Section 9.06:

> "Purchaser[3] covenants to provide good faith financial support to the Company during the Earn-Out Period. For the purpose of this Section 9.06, Purchaser's good faith financial support shall not be deemed to require Purchaser to provide financing in excess of that justified by the Acquired Business's sales volume or pre-tax profit margin in any given period."

Article 10 of the APA provided for the earn-out payments that plaintiffs would receive. They were based on the performance of the business that plaintiffs sold, which was Horton-Portland's only business during this period. Section 10.01 defined the earn-out and established the accounting procedures for determining its amount. Section 10.02 limited Horton-Portland's management and evaluation of the business during the earn-out period:

> "At all times during any Earn-Out Year, in managing the operations of the Acquired Business, the Purchaser shall apply operating, performance and financial criteria to the business of the Acquired Business substantially similar

---

[3] Under the APA, Horton-Portland was the "Purchaser," while Horton was the "Parent." The "Company" was RMP, whose assets Horton-Portland was purchasing. We discuss below how the parties apply those definitions to Section 9.06.

to the criteria applied to the Parent's other operating divisions, subject to such departures therefrom as in the Purchaser's reasonable judgment may be required by any market conditions affecting the business of the Parent or the Acquired Business subject to Purchaser[']s obligations pursuant to Section 9.06 above. Provided that no corporate overhead other than the amount in Section 10.01(b) above shall be allocated to the entity for which 'Earn-Out' payments are being calculated."

(Underscoring in original.)

Finally, and as a part of the overall transaction, Pollock and Horton-Portland entered into an employment agreement under which Pollock was to be responsible for Horton-Portland's day-to-day operations. The employment agreement was expressly tied to the earn-out, expiring at the end of the earn-out period. It could also terminate earlier for a number of reasons, including cause, which the agreement defined in part as that Pollock had "committed any act of fraud, embezzlement or theft in connection with his duties hereunder."

Before Pollock sold RMP's assets to Horton-Portland, he had routinely used its money to pay for work on his own homes and for other personal matters. RMP showed those expenses on its books as shareholder loans. After the sale, Horton-Portland paid some equipment rental fees for work on Pollock's personal residence and his beach home. Pollock did not become aware of those payments until after plaintiffs filed the complaint in this case. In addition, Pollock moved Horton-Portland's offices from the location that RMP had used to a building that he owned.[4] He rented the top floor of the building to Horton-Portland for its offices and the lower floor to his father-in-law's business. He intended for Horton-Portland to pay the cost of remodeling the space that it used and, in return, intended to charge it rent that was significantly below the market rate. He did not intend to have Horton-Portland pay for remodeling the lower floor, but, in fact, the Horton-Portland bookkeeper paid all of the remodeling bills for both floors from company funds.[5] When Pollock

---

[4] RMP's previous offices had become inadequate, and Pollock had decided before the sale to move to the new location.

[5] Horton knew that Pollock was the owner of the building, that he intended to remodel it at Horton-Portland's expense, and that he intended to charge a

learned of that action, he instructed the bookkeeper to determine the amount that the company had overpaid so that he could reimburse it. The bookkeeper had not completed that calculation at the time of his resignation, in part because the same suppliers and subcontractors generally worked on both parts of the building and it was not easy to divide their bills between the floors. Pollock was embarrassed about the situation and did not inform his superiors about it. During the course of this litigation, he used records that defendants provided during discovery, calculated the amount that he believed he owed, and paid it.

Pollock also had a Horton-Portland employee attend hearings concerning whether to include property that Pollock owned in the Portland metropolitan urban growth boundary. Inclusion would make the land potentially available for development and thus increase its value. The employee spent 53 hours on the project, time that he would otherwise have spent on Horton-Portland's business. Pollock believed that, because of the noncompetition provisions in the APA, Horton-Portland would be the only possible purchaser or developer of the land; it was not abnormal for the employee to attend hearings on land that the company was interested in purchasing.

The purchase of RMP's assets closed on June 8, 1998. During the rest of that year, Pollock prepared Horton-Portland for significant future growth by purchasing land and preparing to build houses on it and by increasing its staff. He also worked to fit the division's operations into the Horton system. Horton-Portland invested about $30 million for those purposes. As a result, RMP and Horton-Portland sold fewer houses in 1998 than RMP had sold in 1997. Pollock did not expect to receive anything from the earn-out for the first year[6] but believed that his preparations would produce large amounts in the remaining three years. The business's

___

below-market rent. It encouraged Pollock to charge a rent that would not be too low but would be fair to him. Horton learned before Pollock's resignation that it had paid for work on the lower floor but did not raise the issue with Pollock until afterwards. After Pollock's resignation, Horton-Portland moved to a larger location, paying over four times what it had paid Pollock.

[6] Under the APA, the first earn-out year began on July 1, 1998, which was the first day of the month following the closing of the sale.

profits in calendar year 1998 were slightly less than $1 million after adjusting for one-time charges related to the sale. That was less than RMP's profits in the immediately preceding years, but Pollock believed that the reduction was the necessary consequence of preparing for future growth.[7]

In accordance with Pollock's plan, in early January 1999 Horton-Portland began increasing the number of its housing "starts."[8] Pollock intended to continue increasing starts during the winter and early spring so that Horton-Portland would have a large inventory of houses available at the height of the selling season in the spring and summer. His ultimate goal was for the business to sell 1,000 houses a year. He believed that, in order to do so, it would have to develop an inventory of about 700 starts, including 200 or more that were completed and ready to sell. Those figures were based on continuing the business's focus on first-time buyers, which is what he believed Horton expected him to do.

In early February 1999, without any warning or prior consultation, Pollock's superiors at Horton instructed him to limit Horton-Portland's inventory of unsold starts to 150. At that time, Horton-Portland had about 200 unsold starts; thus the restriction ended its ability to increase its inventory in preparation for the prime house-buying season, which would begin in the spring. According to defendants' witnesses, the primary reasons for imposing the limitation were Horton's concern about the low profitability of the business in 1998, the high percentage of spec homes in its inventory, and what Horton believed to be relatively low margins on each sale. Pollock's superiors had not previously expressed those concerns to Pollock and, in fact, had complimented him on his work with Horton-Portland. The limitation was not the result of a lack of resources; at the time Horton had more money available than it had opportunities.

---

[7] Among other things, Horton discouraged Pollock from starting new houses during the due diligence period, which reduced both starts and sales during 1998.

[8] A "start" is a house on which construction has begun. The parties generally use the term to refer to houses that either are under construction or are completed but not sold.

Viewing the evidence most favorably to plaintiffs, the reasons that defendants give for the limitation do not justify it under the APA. Horton-Portland's lower profits in 1998 were the result of preparing for dramatic growth in the future by making precisely the kinds of investment that the parties contemplated at the time of the sale. Horton knew at that time that Pollock was primarily a builder of spec homes for the first-time buyer market, and it knew that he focused on the volume of sales, rather than the high margins on individual sales, as the source of his profits. Horton also had adequate information before the purchase to determine RMP's profit margins and other methods of operation; indeed, the offering memorandum showed profit margins similar to those about which defendants subsequently complained.[9]

Pollock believed that, in part because of the seasonal nature of the Portland market for new houses, the restriction to 150 starts would make it impossible for Horton-Portland to earn sufficient profits for him to receive anything from the earn-out provision of the APA, let alone what the parties intended him to be able to receive. The required inventory reduction would make it impossible to build sufficient houses at the right time to sell the number of houses that he projected. Pollock explained those things to Horton executives, telling them that, as a result, the limitation breached the APA.[10] When Pollock asked a Horton executive how he could achieve his earn-out if Horton put those controls on what Horton-Portland was building, the response was that that was not the executive's concern.

Pollock was also worried that the limitation would force him to renege on commitments that he had made on behalf of Horton-Portland, thus damaging his reputation in the community and making it impossible for him to continue to do business successfully. He was particularly concerned about one parcel that he had committed to purchase on which

---

[9] There are also indications in the record that Horton was surprised by some of the other ways in which Pollock did business—such as developing a number of relatively small subdivisions rather than a few large projects—and did not understand that they were characteristic of the Portland market. Horton had had ample opportunity to learn all of those things during the due diligence period.

[10] Pollock explained that he anticipated receiving as much as $19 million from the earn-out provision if he were able to build houses as he had planned.

Horton executives wanted him to renege. The executives responded that they had purchased the right to dictate what he could build. After Pollock's resignation, the company decided to proceed with the purchase of that parcel. The company also told his successor that he could have as many as 250 starts in his inventory and that he should speak to a Horton executive if he wanted to increase that number.

Pollock's conversation with the Horton executives led him to conclude that he would not have an opportunity to receive anything from the earn-out. As a result, he hand-wrote a letter of resignation, in which he stated that he was resigning because Horton had breached its contract with him. A Horton executive persuaded him to withdraw that letter and replace it with one that did not give a reason for the resignation; the executive explained that the change would help make for a smoother transition. He told Pollock that the company needed his cooperation for the transition and promised that it would work out fair compensation for his earn-out rights. However, the executive never proposed any specific resolution and stopped returning Pollock's calls shortly after his resignation.

Pollock filed this action on March 16, 1999, alleging that defendants violated both Section 9.06 of the APA and the implied covenant of good faith and fair dealing in the APA by failing to provide adequate financial support to the business during the earn-out period. In a second claim, he alleged that defendants breached the employment agreement by terminating it and failing to pay his salary and benefits. Defendants denied Pollock's allegations and asserted affirmative defenses of waiver and estoppel based on his resignation. Defendants also counterclaimed for breach of fiduciary duty because of what they alleged to be his misuse of company funds and employees for his personal purposes. Those actions, defendants allege, also constituted cause for his termination. The trial court granted summary judgment to defendants on all claims on the ground that Pollock voluntarily resigned and that defendants did not act in bad faith. It also indicated that, if it had reached the issue, it would have ruled that Pollock's actions gave defendants cause for discharging him. Plaintiffs appeal.

The analysis of plaintiffs' first and second assignments of error is closely related, and we will consider them together. In their first assignment, plaintiffs assert that the trial court erred in concluding, as a matter of law, that defendants' decision to limit Horton-Portland's inventory was not an arbitrary decision designed to force plaintiff out and that there was no evidence of bad faith by defendants. In their second assignment, they assert that the trial court erred in concluding, as a matter of law, that plaintiff voluntarily resigned his position and thus terminated defendants' contractual obligations to him. Both assignments turn on whether there is evidence from which a jury could find that the inventory limitation was a material breach of defendants' express or implied obligation to act in good faith in the performance of the APA and the employment agreement. We first consider whether a jury could find that there was a breach; we then discuss whether it could find that the breach was material, which would discharge Pollock's duty to give further performance. *See Wasserburger v. Amer. Sci. Chem.*, 267 Or 77, 82, 514 P2d 1097 (1973).[11]

For at least 40 years, Oregon courts have held that every contract contains an implied obligation that the parties will perform it in good faith. *See Comini v. Union Oil Co.*, 277 Or 753, 756, 562 P2d 175 (1977); *Perkins v. Standard Oil Co.*, 235 Or 7, 16, 383 P2d 107, 383 P2d 1002 (1963). Although it is impossible to define good faith in all circumstances, at its heart is each party's obligation to perform the contract, including exercising any discretion that the contract provides, in a way that will effectuate the objectively reasonable contractual expectations of the parties. *See Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 615-16, 892 P2d 683 (1995); *Best v. U.S. National Bank*, 303 Or 557, 563, 739 P2d 554 (1987). The focus is on the parties' agreed common purpose and justified expectations, both of which are closely related to

---

[11] Defendants point out that plaintiffs allege a breach of the APA and assert that that could not justify Pollock ceasing to perform his obligations under the separate employment agreement. However, both the APA and the employment agreement were parts of the same transaction, and they are closely interconnected, especially with regard to the earn-out. We therefore treat them as parts of one contract. *See Snow Mountain Pine, Ltd. v. Tecton Laminates Corp.*, 126 Or App 523, 528, 869 P2d 369, *rev den*, 319 Or 36 (1994).

the express provisions of the contract. *OUS v. OPEU*, 185 Or App 506, 515-16, 60 P3d 567 (2002). In *Best*, for example, the plaintiffs challenged the defendant bank's fees for processing nonsufficient funds checks. The fees were considerably greater than the costs that the banks incurred in processing such checks. The Supreme Court held that, although the bank had discretion under the checking account contract to set the fees, there was a question of fact of whether charging substantially more than the cost of the service was consistent with the parties' reasonable expectations when they entered into that contract. *Best* 303 Or at 565-66.

■ In Section 9.06 of the APA, Horton-Portland expressly agreed to provide good faith financial support to the business during the earn-out period, subject to two limitations.[12] It does not have to provide financing greater than what the business's sales volume or pretax profits would justify. Section 9.06 states the extent of Horton-Portland's good faith obligation to provide financing for the business. The implied obligation of good faith does not vary the substantive terms of a contract or require a party to refrain from doing what the contract expressly permits it to do. *See Lund v. Arbonne International, Inc.*, 132 Or App 87, 91-92, 887 P2d 817 (1994); *see also Uptown Heights Associates v. Seafirst Corp.*, 320 Or 638, 646-48, 891 P2d 639 (1995) (it is not a breach of good faith for a party to enforce a remedy that the contract expressly provides). Thus, Section 9.06 supersedes the implied obligation to perform in good faith for the precise subject that it covers. *Cf. U. S. National Bank v. Boge*, 311 Or 550, 564, 814 P2d 1082 (1991) (Uniform Commercial Code definition of "good faith" supplants common-law implied obligation in situations to which UCC definition applies). It does not, however, otherwise affect the implied obligation.

---

[12] Taken literally, the meaning of Section 9.06 is unclear. It requires the "Purchaser" to provide good faith financing to the "Company." However, Horton-Portland (the "Purchaser"), not RMP (the "Company"), operated the business after the effective date of the APA. It is not clear why Horton-Portland would have an obligation to provide financial support to RMP, as the provision literally requires, or how such support could have an impact on the amount of the earn-out. The parties appear to assume that Section 9.06 requires Horton-Portland to give good faith support to the *business* that it purchased from RMP, which was the only business in which Horton-Portland was engaged at the relevant times. We agree with that construction of the APA.

The APA does not define "good faith," and we therefore apply the meaning that Oregon law normally gives to the term.[13] Because the fundamental requirement of good faith is to perform the contract in a way that will carry out the purposes of the parties in entering into it, we first consider their purpose in adopting the earn-out provision. In doing so we look at the terms of the APA, understood in light of the circumstances at the time. *See* ORS 42.220.[14]

The earn-out served at least two purposes. First, the APA expressly states that it was part of the compensation for the sale. The earn-out provided a way for Horton to acquire the business for less than Pollock thought it was worth and, at the same time, to give Pollock the potential of receiving considerably more. Second, by allowing Pollock to share in the profits of the business, the earn-out gave Pollock an incentive to use his best efforts, as its manager, to make it profitable after the sale. Each of those purposes benefitted both plaintiffs and defendants. Horton paid less for the business than Pollock wanted; in return, Pollock had the opportunity to receive more than he would have otherwise received. Horton obtained Pollock's experience and ability in managing the business; in return, Pollock had the opportunity to share the profits that he produced.

Section 9.06 recognizes that the earn-out created a good-faith obligation for Horton-Portland to provide substantial financing for the business. The reason for that obligation is clear: In order for the earn-out to serve its purposes, the business's profits had to be substantially greater than they had previously been. In order for plaintiffs to receive anything from the earn-out those profits had to be over $3.75 million for the first three years and over $4 million for the final year. Before the sale, RMP's largest yearly profit was approximately $3 million. Thus, the earn-out created a common goal

---

[13] The APA expressly provides that Oregon law governs the agreement.

[14] ORS 42.220 provides:

"In construing an instrument, the circumstances under which it was made, including the situation of the subject and of the parties, may be shown so that the judge is placed in the position of those whose language the judge is interpreting."

for the parties of producing significant growth in the business's profits. Horton-Portland's contribution to that common goal was to give the financial support that would make substantial growth possible.

All parties knew that, before the sale, Pollock relied on the volume of sales rather than high gross margins on each sale for the business's profits. Before the purchase, Horton told Pollock that it expected him to operate as an entrepreneur, relatively independently of central supervision, which could reasonably mean that it expected him to continue to function as he had previously done. If so, Horton-Portland's agreement in Section 9.06 to "provide good faith financial support to the Company during the Earn-Out Period" means that it would provide the necessary support for him to increase the business's profitability by following the precise policies that had made it profitable in the past— policies that had made it an attractive investment for Horton. Without that support, the earn-out would be worthless. Thus, a jury could find that the financial support that Section 9.06 obliged it to provide was reasonable support for the way that Pollock did business.

The APA includes criteria for evaluating what support was reasonable. Section 9.06 required that support unless it was not justified by the sales volume or pretax profit margin.[15] Section 10.02 required Horton-Portland to apply operating, performance, and financial criteria to the business that were substantially similar to those that it applied to Horton's other operating divisions. That requirement was expressly subject to Horton-Portland's obligations under Section 9.06 and, thus, did not modify them.[16] The question is whether there is evidence from which a jury could find that the limitation to 150 starts in inventory violated the express obligation in Section 9.06 to provide good faith financing. We conclude that there is.

■ In the six or seven months after the purchase, Horton-Portland invested $30 million in the business.

---

[15] The reference to pretax profit margin is to the profit margin of the business as a whole, not to the percentage of profit on each individual sale.

[16] One apparent purpose of this provision is to avoid accounting manipulations that would reduce the amount of the earn-out. Section 10.01(b) also contains accounting requirements for that purpose.

Pollock used that money to purchase land and to make other preparations to increase the number of starts in 1999. Both Pollock and Horton-Portland understood that the purpose of the investment was to make it possible to increase the number of sales in 1999 and future years. It was what the parties anticipated at the time of the sale and what Section 9.06 required. A jury could find that in late February 1999, when Horton-Portland suddenly imposed a limitation of 150 starts in inventory at a time when there were already 200 starts in its inventory, it violated both the parties' understanding and the good faith requirement of Section 9.06. Its action made it impossible to take advantage of the preparations in a way that would produce the profits that the agreement contemplated.

In imposing the limitation of 150 starts, defendants neither considered nor complied with their obligations under Section 9.06. That may in itself be evidence of bad faith. Defendants' expressed reasons for the decision were inconsistent with acting in good faith to achieve the purposes of the parties in entering into the APA. Defendants' concerns about the large number of spec homes in the Horton-Portland inventory was inconsistent with their knowledge that the business that they purchased was a spec home builder. In the same way, their concern about what they saw as a relatively low gross margin per house was inconsistent with their knowledge that the business operated on comparable margins at the time of the purchase. The reasons that defendants gave for imposing the limitation, thus, were contrary to things that were necessarily in the contemplation of the parties at the time of the purchase. They gave no consideration to their obligations to plaintiffs under Section 9.06. The jury could find that, in imposing the limitation, Horton-Portland did not act to fulfill its good faith obligations but, rather, exercised its power as the owner of the business to change an essential component of the agreement between plaintiffs and defendants without regard to the effect of the change on plaintiffs. It thereby frustrated rather than furthered the parties' objectively reasonable expectations.[17]

---

[17] Giving Pollock's successor a significantly higher limitation on unsold starts may also be evidence of defendants failure to act in good faith.

Defendants argue that the evidence shows only that the parties had different ways of operating the business and that defendants were not willing to accept the level of risk that Pollock's method of operating imposed. They assert that the limitation involved only unsold houses and that Pollock could have met it simply by increasing sales without necessarily significantly reducing starts. They note that Horton-Portland invested a large amount in the business in the months after the purchase. According to defendants, the earn-out was simply a performance bonus and Pollock did not perform in a way that entitled him to any part of it; rather, he voluntarily resigned before the end of the first earn-out year. Their refusal to give Pollock *carte blanche* was not a failure to act in good faith under the APA.

The difficulty with defendants' arguments is that they are based in part on defendants' view of the evidence and in part on a misunderstanding of the nature of the earn-out. They might well be appropriate arguments at trial, but they do not fully engage with the more restricted role of contradictory evidence on summary judgment. In particular, defendants do not recognize the significance to plaintiffs' view of the case either of defendants' knowledge of plaintiffs' methods of operation before the purchase or of the nature of the earn-out as consideration for the purchase rather than as compensation for Pollock's services. Those things could lead a trier of fact to conclude that the good faith obligation limited defendants' ability to impose their preferred methods of operation on plaintiffs during the earn-out period and that the 150 starts limitation transcended those limits.

■ For these reasons, we conclude that there is an issue of fact of whether defendants breached their obligations to perform the APA in good faith. That requires us to consider whether the jury could also find that the breach was a material breach. Pollock was justified in resigning if defendants committed a material breach, and he did not give up his claim for damages by doing so.[18] Whether there is a material breach

---

[18] The jury could find that Pollock resigned because he believed that defendants had breached the APA. The fact that, at defendants' request, he withdrew his first resignation letter and substituted another that did not expressly state the cause for his resignation does not affect that fact.

is ordinarily a question of fact. *Wasserburger*, 267 Or at 82. We conclude that the jury could find that the breach was material.

■ In *Bisio v. Madenwald*, 33 Or App 325, 331, 576 P2d 801, *rev den*, 283 Or 1 (1978), we summarized and applied the criteria in *Restatement of Contracts* § 275 (1932) for determining whether a breach is material. Since *Bisio*, *Restatement (Second) of Contracts* § 241 (1981) has expanded on those criteria and now provides that the following circumstances are significant in determining whether a failure to render or offer performance is material:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

"(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

"(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

"(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

"(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

Those are appropriate criteria and we adopt them in guiding our evaluation of the evidence on summary judgment.

■ If the jury were to find that the 150 starts limitation was a breach of the APA, it could also find that that breach will deprive plaintiffs of the benefit of the earn-out. Thus, the first criterion weighs in favor of materiality. It appears that plaintiffs could be compensated for the breach by money damages while Pollock continued to render his own performance under the employment agreement, so the second criterion weighs against materiality. The remaining criteria all weigh in favor of materiality. Defendants did not suffer a forfeiture from Pollock's resignation; rather, they retained the business and replaced Pollock with a new manager. Defendants' actions and statements at the time made it unlikely that they would cure their failure to perform in good faith,

and the jury could find that their behavior did not comport with standards of good faith and fair dealing. On balance, the jury could conclude that defendants' breach was material and that Pollock's resignation was justified. The trial court erred by granting defendants' motion for summary judgment on the ground that Pollock waived his right to enforce the APA by resigning or that he was estopped from doing so.

In their third assignment of error, plaintiffs assign error to the trial court's conclusion that Horton is not liable for any failure by Horton-Portland to perform in good faith. They rely first on Section 11.02 of the APA, under which Horton and Horton-Portland, jointly and severally, agreed to "indemnify, defend, reimburse, and hold [plaintiffs] * * * harmless" from any and all claims that arose from or were related to "[a]ny failure to perform or observe any term, provision, covenant, or agreement to be performed or observed by" Horton or Horton-Portland. Plaintiffs argue that that indemnity agreement makes Horton liable to plaintiffs for any breach of Horton-Portland's obligations to them.

■ The threshold problem with plaintiffs' argument is that they did not comply with the procedural requirements for asserting rights under the indemnity provision. Section 11.03(d) of the APA provides that, if one party has a claim against the other that does not involve a third-party claim, which is the situation in this case, then the party seeking indemnity

> "shall transmit to the indemnifying party a written notice (the 'Indemnity Notice') describing in reasonable detail the nature of the claim, an estimate of the amount of damages attributable to such claim and the basis of the Indemnified Party's request for indemnification under this Agreement."

(Underscoring in original.) Plaintiffs assert that a letter that their attorney wrote to Horton on March 10, 1999, satisfied the notice requirement. However, in that letter the attorney stated only that Horton was "in breach of that Asset Purchase Agreement, including, among other provisions, the good faith and earn-out provisions." The claim, thus, was against Horton directly, not as an indemnitor of Horton-Portland's obligations. There is no reference in the letter

to any indemnity claim, under the APA or otherwise. In addition, plaintiffs did not state a claim for indemnity in their complaint.[19] Plaintiffs simply did not invoke whatever rights they might have under Section 11.02.

■ Plaintiffs also argue that Horton directly violated its own implied good faith obligations under the APA. We agree with plaintiffs that there is sufficient evidence to avoid summary judgment on that issue. The jury could find that Horton directly made the decision to limit Horton-Portland's inventory of starts. The decision was made at Horton's headquarters in Texas by officers of Horton. They then communicated it to Pollock in Portland. The jury could reasonably infer that they were acting as Horton's agents and for its benefit when they did so. Horton is a party to the APA and has an implied duty to perform in good faith, even though it is not subject to the express good faith obligation of Section 9.06. Horton was fully aware of all of the circumstances that we previously described, and the jury could find that, by its decision to impose the limitation, it breached its implied obligation to perform the APA in good faith. The trial court therefore erred in dismissing plaintiffs' claims against it.

In their fourth assignment of error, plaintiffs assign error to the trial court's conclusion that defendants had the right to discharge Pollock because of his misappropriation of defendants' resources for his private benefit. The trial court apparently believed that, if Pollock breached the employment agreement to the extent that would justify his termination, defendants cannot be liable for any breaches of the APA that they may have committed.[20] If that conclusion is correct, it would provide an alternative basis for affirming the trial court's judgment in favor of defendants.[21] We conclude, however, that defendants are not entitled to summary

---

[19] Plaintiffs argue that they pled the performance of all conditions precedent and that Horton failed to allege in its answer that they had not given the notice that Section 11.030(d) requires. Thus, plaintiffs assert, Horton has waived that defense. *See* ORCP 20 A (stating pleading requirements for conditions precedent). Because plaintiffs have not stated a claim for indemnity, there was no reason for Horton to raise the notice issue at the pleading stage.

[20] Under the employment agreement, Pollock's employment would terminate at the time that he engaged in activity that constituted cause for termination.

[21] Plaintiffs argue that defendants failed to plead this issue adequately. We reject that argument without discussion.

judgment on whether Pollock's actions justified his termination.

■ The employment agreement permits Horton-Portland to discharge Pollock for cause, which it defines as including that Pollock committed "any act of fraud, embezzlement or theft in connection with his duties hereunder." We first consider whether there is an issue of fact of whether Pollock committed fraud. Because the employment agreement provides that it is to be construed in accordance with Oregon law, we begin with the Oregon definition of fraud. Under Oregon law, proof of fraud generally requires a showing that

> "(1) the accused had falsely represented a material fact; (2) the accused knew that the representation was false; (3) the misrepresentation was made with the intent to induce the recipient to act or refrain from acting; (4) the recipient justifiably relied on the misrepresentation; and (5) the recipient was damaged by that reliance."

*In re Brown*, 326 Or 582, 595, 956 P2d 188 (1998); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 405-06, 737 P2d 595 (1987).[22]

■ To have committed fraud, Pollock must have made a misrepresentation. Defendants appear to argue that he did so by failing to disclose his personal use of company funds. They correctly point out that silence or concealment of facts, particularly when there is a duty to speak, can serve as the basis for a fraud claim, *see Whitlatch v. Bertagnolli*, 45 Or App 985, 989, 609 P2d 902 (1980), and that when one party has a fiduciary relationship to the other a simple failure to make a full and fair disclosure of the facts may constitute fraud. *See In re Brown*, 326 Or at 595. That silence, concealment, or failure to disclose, however, must relate to something that constitutes a representation. That something is a representation is shown, among other ways, by the intent that the other party rely on it and the other party's actual reliance. Here, the only apparent action that defendants took

---

[22] At times the Oregon courts have listed nine elements of fraud, rather than five. *See, e.g., Conzelmann v. N.W.P. & D. Prod. Co.*, 190 Or 332, 350, 225 P2d 757 (1950). We do not perceive a substantive difference between the two sets of elements.

as the result of Pollock's alleged failure to disclose was failing to terminate his employment.

Defendants' position, thus, is that a fiduciary who fails to disclose the fiduciary's alleged misconduct represents that there was no misconduct, and thereby commits fraud, even in the absence of some action that constitutes reliance. In support, it relies on *Veale v. Rose*, 657 SW2d 834, 837-38 (Tex App 1983), in which the court held that one partner's misappropriation of partnership property for his own use was constructive, if not actual, fraud. However, as a subsequent Texas case makes clear, constructive fraud is distinct from actual fraud. *Welder v. Green*, 985 SW2d 170, 174-75 (Tex App 1998), was also a dispute in which one partner recovered a judgment against the other for fraud. The trial court instructed a jury on both actual fraud and constructive fraud. The verdict was in the plaintiff's favor, but the trial court refused to enter judgment on it. On appeal, the appellate court analyzed the two theories of fraud as separate tort claims. It first held that there was no evidence that the defendant intended to breach his fiduciary duties at the time that the plaintiff left the partnership or that the defendant made any other misrepresentation. Thus, the court held, there was no proof of actual fraud. It then distinguished a claim for actual fraud from one for constructive fraud. In that respect, it said, a claim for constructive fraud was identical to a claim for breach of fiduciary duty, citing *Veale* as an example of constructive fraud. It then held that there was some evidence to support the constructive fraud claim.

██ ██ Here, the employment agreement makes fraud a ground for termination, but it does not refer to either constructive fraud or breach of fiduciary duties. Like Texas law, Oregon law distinguishes constructive fraud from actual fraud. The Supreme Court has cited authorities that emphasize that constructive fraud is simply a catch-all term for a variety of transactions in which the courts have decided that fraud-type relief is appropriate; many of those transactions do not require either intent to deceive or actual dishonesty of purpose. *See U. S. Nat. Bank v. Guiss et al*, 214 Or 563, 585-86, 331 P2d 865 (1958). It has also expressed some skepticism about the theory. *See Knight v. Woolley Logging Co.*, 278 Or 691, 694-95, 565 P2d 748 (1977). We have recently referred to

constructive fraud in describing those provisions of the Uniform Fraudulent Transfer Act, ORS 95.220 to 95.310, that void transfers without requiring a showing of actual intent to defraud a creditor. *See Doughty v. Birkholtz*, 156 Or App 89, 96, 964 P2d 1108 (1998); *Morris v. Nance*, 132 Or App 216, 222, 888 P2d 571 (1994), *rev den*, 321 Or 340 (1995). Constructive fraud, thus, is not common-law actual fraud. Nothing in the employment agreement suggests that the parties intended to make constructive fraud a ground for termination. Indeed, the employment agreement couples "fraud" with "embezzlement or theft," each of which involves actual dishonesty of purpose. We conclude that the parties meant actual fraud when they referred to "fraud."

■ There is a genuine issue of fact as to whether Pollock committed actual fraud. Defendants assert that three actions were fraudulent: charging Horton-Portland for equipment that was rented for use at his own homes; charging Horton-Portland for the cost of remodeling the building where Horton-Portland had its offices; and having a Horton-Portland employee attend meetings concerning Pollock's property.

The charges for equipment rentals followed Pollock's practice when he was the sole owner of the business, and a jury could find that the bookkeeper simply continued the practice without Pollock's knowledge. He testified that he was not aware before his termination that the charges had continued. He agreed that he should reimburse Horton-Portland for those costs and has done so.

There are two aspects to the remodeling issue. The first involves the cost of remodeling the upper floor of the building, where Horton-Portland had its offices, and the second involves the remodeling of the lower floor. There is an issue of fact in each case. Pollock testified that defendants knew that he intended to charge Horton-Portland for the cost of remodeling the upper floor, giving it a below-market rent in return. He also testified that charging Horton-Portland for the cost of remodeling the lower floor was a mistake, which he took steps to correct when he learned that it had happened. In both cases, there is at least an issue of fact as to whether he committed actual fraud.

 Finally, the jury could find that Pollock believed that having a Horton-Portland employee attend meetings concerning making Pollock's property available for development was at least in part for the benefit of Horton-Portland. Pollock expected that Horton-Portland would ultimately purchase and develop the property. He believed that he would be unable to sell it to anyone else or develop it on his own without breach of the noncompetition provisions of the APA. Attending meetings concerning property that Horton-Portland was interested in purchasing was not inconsistent with the employee's duties. Thus, there is a genuine issue of whether Pollock committed fraud as the employment agreement uses the term.[23]

Finally, in their fifth assignment of error plaintiffs assign error to the trial court's grant of summary judgment on defendants' counterclaims for breach of fiduciary duty. Pollock has reimbursed Horton-Portland for the rental equipment used at his own homes and for the cost of remodeling the lower floor of the office building. The remaining issues concern the improvements to the Horton-Portland offices and having the employee attend land use hearings. Assuming that these actions involve self-dealing that Pollock did not adequately disclose, he did not breach his fiduciary duties if they were entirely fair to the corporation. *See Cede & Co. v. Technicolor, Inc.*, 634 A2d 345, 366 n 34 (Del 1993); *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A2d 1261, 1280 (Del 1988);[24] *cf.* ORS 60.361(1)(c) (stating same rule under Oregon law). Pollock has the burden of proving that defense, but there is evidence from which a jury could find that he carried that burden. As a result of the leasehold improvements, Horton-Portland received office space at rents that were well below the market rates.[25] A potential result of the employee's work on the land use issues was that Horton-Portland could

---

[23] For the same reasons, the jury could find that Pollock did not have the necessary intent for his actions to constitute theft.

[24] Both Horton and Horton-Portland are Delaware corporations.

[25] Defendants point out that Horton-Portland had only a month-to-month lease of the space and that Pollock could thus have forced it to move out long before it recouped the cost of the improvements. If Pollock had terminated the lease, or if he had refused to enter into one for a longer term, there might be some force to defendants' arguments. However, Pollock did not do so; rather, Horton-Portland decided to move after Pollock's resignation.

have obtained additional developable land. The trial court erred in granting summary judgment on these counterclaims.

Reversed and remanded.